STATE of Wisconsin,
Plaintiff-Respondent,

v.

Justin YANG,
Defendant-Appellant.

Court of Appeals

*No. 2005AP817–CR. Submitted on briefs January 31, 2006.
—Decided February 21, 2006.*

## 2006 WI App 48

(Also reported in 712 N.W.2d 400.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John J. Grau* of the *Grau Law Office*, of Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Jeffrey J. Kassel*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. FINE, J. Justin Yang appeals a judgment entered on a jury verdict convicting him of the repeated first-degree sexual assault of one of his daughters, born in July of 1991. *See* WIS. STAT. § 948.025(1)(a) (three or more assaults of a child within a specified time). The jury acquitted him of the same charge involving another daughter, born in August of 1990. He claims that the trial court denied him his right to confrontation when it limited his cross-examination of his former wife. We agree and reverse.

## I.

¶ 2. Yang and his former wife were married in 1984. They were both born in Laos, and they came to the United States in 1990. Yang became a citizen in 2002, the year he and his former wife divorced. In mid-2001, before the divorce, Yang's former wife moved out of the home she had shared with Yang. At some point, three of their children went to live with their mother, and four, including the two daughters who accused Yang of assaulting them, stayed with him. In 2002, Yang went to Laos to bring to the United States a woman whom he married in October of 2003.

¶ 3. The crux of the State's case against Yang involving the assaults of which he was convicted, was that Yang's daughter, who was then living with Yang, complained to her mother that he had assaulted her and that, as a result, she wanted to live with her, rather than with Yang. Yang's former wife testified that she immediately called a Hmong support group as well as a child-protection agency, but did not pick up the girl and her sister until three days later, when she also called the police. A sexual-assault nurse-practitioner testified that

238

there were no physical signs of an assault when she examined the daughter five days after Yang's former wife called the police and took the girls out of Yang's home.

¶ 4. Yang's defense was, essentially, that either the daughters made up the assault-charges so they could live with their mother, or that the mother and the daughters falsely accused Yang because they were angry about the divorce and Yang's remarriage. Yang's trial lawyer outlined this defense in his opening statement to the jury:

> He comes back to the United States and in January of 2003 there's a confrontation with the ex-wife, the mother of his children. During this conversation she questions why did you go and get another wife. And he explains, I needed someone to help me, and she says to him, she says these words to him, she says now maybe you're going to have trouble. That's what she says to him. Six weeks later she calls the police, the ex-wife, and she tells the police that — maybe she calls some other folks, too, Justin Yang has sexually assaulted his two young daughters.

¶ 5. Yang's former wife testified in English, which she said she was able to do, but she also had the help of a translator. When Yang's lawyer tried to ask Yang's former wife on cross-examination about the alleged threat ("maybe you're going to have trouble"), the trial court stopped him.

> Q. [by Yang's lawyer] Now, do you — do you remember speaking with Justin Yang in January of 2003:
>
> (Asks for clarification from interpreter.)
>
> A. No, I don't talk to him at all.
>
> Q. You never talked to him at all?

239

A. No.

Q. You wouldn't call him on the phone?

A. I sometime, I call him, because the children go to visit him and what time they get the children to come back, that's all.

Q. Okay. Were you aware that Justin Yang went to — to Laos in December of 2002?

A. Yes, I know that.

Q. Did you ever talk to him about that?

A. No. No.

Q. Okay. So do you recall in January of 2003 ever having a conversation with Justin Yang, and in that conversation you asked him, why did he go and get another wife? Do you recall that?

A. No.

Q. Are you saying that you don't remember it or it didn't happen?

A. I — no, I don't — I don't call him like that.

Q. Okay. Let me ask you a better question because I'm not necessarily suggesting that you called him. Okay. Let me ask you a better question. Whether it was on the telephone, or in person, did you ever question Justin Yang about him going to Laos in December of 2002 to get another wife?

A. I don't remember about — I remember right, I don't ask him like that.

Q. Okay. Did you ever talk to him about it at all? Just any kind of conversation at all?

A. No.

240

Q. Okay. Did you ever make the statement to Justin Yang —

THE COURT: Mr. Cubbie [Yang's lawyer], side bar.

(Parenthetical in court reporter's transcript.) The trial court conferred with the lawyers off the record and prevented Yang's lawyer from asking about the alleged threat. In a post-conference reconstruction of the off-the-record discussion, the trial court explained its rationale.

¶ 6. First, it noted that it perceived that Yang's former wife had, in her testimony, denied discussing with Yang his trip to Laos or his new wife.

> In if [sic] fact the witness has already indicated they did not have a conversation, what is the point then of asking about specific statements within a conversation that the witness already said never occurred. The only point would be that it is to leave an inference in the question itself in the minds of the jurors.

> . . . .

> I think that if you ask whether or not a conversation has occurred, and you've asked enough about the specifics about whether it was a conversation about Laos, whether it was a conversation about Laos and bringing the wife — a new wife home from Laos and a witness tells you that they never talked about that, you're not then allowed to get around that denial by the witness, or that answer by the witness, by making further inquiry about particular statements that may have occurred within that conversation that the witnesses [sic] already said didn't occur.

In denying Yang's motion for a mistrial, the trial court reiterated that it was concerned that if it had permitted the further cross-examination, "it would be

241

tantamount to allowing the defense to get in something that — through their own way of asking a question through a question that they haven't been able to elicit through testimony."

¶ 7. Second, the trial court referred to its earlier ruling excluding evidence that Yang had physically and verbally abused his former wife during their marriage.

> Moreover, because it was on what I believe to be an issue of going to the witness's motives, it was going to open the door to that very arena that I advised both counsel was not going to be — was going to be very limited and that was the rehabilitation, an area that would be problematic for both parties, because, depending on how far defense counsel went with that line of questioning, the State was going to obviously have an opportunity to rehabilitate, and I had already made that ruling and so the parties knew that.

In connection with this aspect of its explanation, the trial court indicated that it had taken "defense counsel's lead actually in an earlier conversation we had had, which was that, Judge, I suspect my inquiry is going to be whether or not she had that conversation, and if she denies it and says no, then that will be the end of it, and then there would be no need for the State to even go into a rehabilitative mode." Significantly, Yang's alleged abuse of his former wife could have been seen by the jury as a reason she left the house they shared, and, also, why she might have had a motive to get him into trouble.[1]

---

[1] When Yang testified, the trial court permitted the State to ask Yang whether he had ever hit his former wife during their marriage and whether he had "threatened to kill her the day that she left." Testifying in Hmong through an interpreter, Yang denied both accusations, and, also, denied assaulting either of

¶ 8. Third, in denying Yang's motion for a mistrial, the trial court also opined that irrespective of whether Yang's former wife had "ill will towards her ex-husband's remarriage" there was nothing in the Record that indicated that this "ill will" was "transferred to the children" so as to spur what Yang contended were their false accusations against him.

¶ 9. As we have seen, the jury convicted Yang of assaulting one daughter, but found him not guilty of assaulting the other. Although Yang testified at the trial, he did not tell the jury about his former wife's alleged threat.

## II.

¶ 10. A trial court's decision to admit or exclude evidence is a discretionary determination that will not be upset on appeal if it has "a reasonable basis" and was made " 'in accordance with accepted legal standards and in accordance with the facts of record.' " *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498, 501 (1983) (quoted source omitted). Whether a trial court's decision to admit or exclude evidence comports with legal principles, however, is a matter that we review *de novo*. *State v. Pittman*, 174 Wis. 2d 255, 275, 496 N.W.2d 74, 82 (1993). One of the trial-process concerns that sets boundaries on what evidence the trial court may exclude in criminal trials is the defendant's right to confrontation.

---

his daughters. The trial court ruled that the questions about Yang's alleged threat to kill his wife and whether he had hit her during their marriage were admissible because Yang had "opened the door" by asserting during his direct-examination that his former wife "left me to go live with somebody else and gave me so much pain."

Every defendant in a criminal case is entitled to confront his or her accusers: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. This clause applies to the states as well as to the federal government. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). The Wisconsin Constitution also guarantees the right to confrontation: "In all criminal prosecutions the accused shall enjoy the right ... to meet the witnesses face to face." WIS. CONST. art. 1, § 7. The two clauses are, "generally," coterminous. *State v. Hale*, 2005 WI 7, ¶ 43, 277 Wis. 2d 593, 607, 691 N.W.2d 637, 644.

*State v. Ellington*, 2005 WI App 243, ¶ 11, 288 Wis. 2d 264, 277, 707 N.W.2d 907, 913.

[A] defendant's right to confront the witnesses against him is central to the truthfinding function of the criminal trial. In *Davis v. Alaska*, 415 U.S. 308 (1974), the United States Supreme Court declared that "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Id.* at 315–16. The right of cross-examination is more than a desirable rule of trial procedure. It is, indeed, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."

However, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. As acknowledged in the case of *Delaware v. Van Arsdall*, 475 U.S. 673 (1985):

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.

244

On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Id.* at 679.

*State v. McCall*, 202 Wis. 2d 29, 43–44, 549 N.W.2d 418, 424 (1996) (some quoted sources and some internal citations omitted). Although we respect the trial court's "wide latitude," we nevertheless conclude on our *de novo* review of the constitutional issue that Yang's right to confrontation was unduly truncated.

¶ 11. Inquiry into a witness's bias is always material and relevant. *State v. Williamson*, 84 Wis. 2d 370, 383, 267 N.W.2d 337, 343 (1978) (bias and improper motive of witness are never collateral). John Henry Wigmore has characterized cross-examination as "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 WIGMORE, EVIDENCE 1367 (Chadbourn rev. 1974). Although, as *Van Arsdall* observes, this does not mean there can be no limits on a defendant's cross-examination seeking to expose bias, the great engine only has power if the trial court does not apply too-restrictive a governor or, to use an old

245

railroading term, shunt it to a "dead track." We analyze Yang's confrontation-denial contention against this background.

¶ 12. First, it is apparent from the transcript that Yang's former wife had fluctuating difficulty in understanding and answering questions. Thirteen times during her thirty-one-page testimony she asked the translator for clarification or help, and, of course, we have no way of knowing what the translator said to Yang's former wife in Hmong, or whether Yang's former wife understood either the full import of the lawyers' questions or nuanced inferences inherent in any language that often filter total comprehension for non-native speakers. Indeed, as material to the issue on this appeal, we do not know what Yang's former wife asked the translator, or what the translator said in response, when the transcript merely says, "(Asks for clarification from interpreter.)."

¶ 13. Both the legislature and the Wisconsin Supreme Court have recognized that fair trials require comprehension of the spoken word—by parties, by witnesses, and by fact-finders. *See* WIS. STAT. § 885.38 (interpreter in court proceedings); *State v. Neave*, 117 Wis. 2d 359, 363–366, 344 N.W.2d 181, 183–184 (1984), *overruled on other grounds by State v. Koch*, 175 Wis. 2d 684, 693–694, 499 N.W.2d 152, 158 (1993); *see also State v. Santiago*, 206 Wis. 2d 3, 13, 556 N.W.2d 687, 690 (1996); THE WISCONSIN COURT INTERPRETERS HANDBOOK, *available at* http://www.wicourts.gov/services/interpreter/docs/hand book.pdf. Although Yang does not contend that he was denied a fair trial because of the language difficulties *per se,* a witness's comprehension affects our analysis of whether a trial court can cut-off cross-examination prematurely. Here, as we have seen from the transcript's

rendition of the questions asked by Yang's trial lawyer of Yang's former wife, and the answers he received, his inquiry into that area was not yet closed. Accordingly, the trial court's invocation of, in essence, "asked-and-denied" to move the trial along was not yet justified, given the critical nature of motive to Yang's defense.

¶ 14. Second, although as the trial court noted, and as the State argues on appeal, there was no direct evidence of collusion between Yang's former wife and the children who asserted that Yang had sexually assaulted them, that is an inference that Yang was entitled to argue to the jury; not every fact in a trial is provable by direct-evidence. Indeed, "circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence," *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752, 755 (1990), and juries are routinely told that circumstantial evidence can be as valuable to the jury as direct evidence, WIS JI—CRIMINAL 170, although Yang's jury was not, apparently because neither side asked for the instruction.

¶ 15. Third, insofar as the trial court was concerned that the jury would accept assertions nested in the questions Yang's lawyer asked Yang's former wife on cross-examination, as long as the lawyer had a good-faith basis for asking the question, *see Oostendorp v. Khanna*, 937 F.2d 1177, 1181 (7th Cir. 1991) (need good-faith basis to ask question), neither he nor the jury was bound by any denial by Yang's former wife, *see Pautz v. State*, 64 Wis. 2d 469, 476, 219 N.W.2d 327, 330–331 (1974) (jurors not bound by even uncontradicted expert-witness testimony); *Krueger v. Tappan Co.*, 104 Wis. 2d 199, 203, 311 N.W.2d 219, 222 (Ct. App. 1981) ("The jury is not bound by the opinion of an

expert, however, even if the opinion is uncontradicted."). We assume that Yang's trial lawyer had a good-faith basis to ask Yang's former wife about her alleged upset over Yang's remarriage because Yang's trial lawyer raised that issue in his opening statement, *see Najafi v. United States,* 886 A.2d 103, 108 (D.C. 2005) (must have good-faith basis for opening statement), and neither the State nor the trial court has contended otherwise. Thus, Yang was entitled to have the jury decide from his lawyer's questions and the nature of his former wife's responses whether she was telling the truth when she denied ever having discussed with Yang his trip to Laos or his remarriage. Thus, he was also entitled to ask about the alleged threat.

¶ 16. Fourth, as pointed out by both the State on this appeal, and by the trial court, Yang testified but he did not tell the jury that his former wife had threatened him. The Record does not reveal why, but it may very well be that Yang's trial lawyer believed that the trial court's earlier ruling foreclosed further exploration of that area.

¶ 17. This was a close case, as evidenced not only by the split verdict but also by the State's acknowledgment during its opening statement that the case against Yang rested on the "credibility" of the various witnesses. Indeed, the State told the jury during its opening statement that the jury should assess credibility of the witnesses by, among other things, asking themselves whether "they have a motive to lie." Although the State represented to the jury in that opening statement that no such motive would be "established on the record," the jury was, of course, free to make its own determination. The cross-examination of Yang's former wife by Yang's trial lawyer would have been an appropriate tool for them to use in making that

assessment. In light of all this we cannot say, as the State urges us to do, that "it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *See State v. Shomberg*, 2006 WI 9, ¶ 18, 288 Wis. 2d 1, 15-16, 709 N.W.2d 370, 377 (quoted sources and second set of internal quotation marks omitted).

¶ 18. In sum, we conclude on our *de novo* review of the constitutional issue presented by this appeal that the trial court should not have derailed Yang's cross-examination of his former wife. Accordingly, we reverse and remand for a new trial.

*By the Court.*—Judgment reversed and cause remanded.