AURORA CONSOLIDATED HEALTH CARE and Sentry
Insurance, a Mutual Company,
Plaintiffs-Appellants,†

v.

LABOR AND INDUSTRY REVIEW COMMISSION
and Jeffrey Schaefer, Defendants-Respondents.

Court of Appeals

*No. 2010AP208. Submitted on briefs October 6, 2010.
—Decided November 30, 2010.*

2010 WI App 173

(Also reported in 794 N.W.2d 520.)

† Petition for Review filed.

804

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Daniel L. Zitzer* and *Carrie May Poniewaz* of *Otjen, Van Ert & Weir, S.C.*, Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Robert W. Ward* of *Ward Law Firm*, Milwaukee.

Before Fine, Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Aurora Consolidated Health Care and its insurer Sentry Insurance, A Mutual Insurance Company (collectively "Aurora") appeal a circuit court order that upheld a decision of the Labor and Industry Review Commission ("LIRC"). The LIRC decision found Jeffrey Schaefer permanently and totally disabled as a result of a work injury and awarded Schaefer benefits on that basis. Aurora argues that LIRC violated the Worker's Compensation Act and denied Aurora its right to due process when it prohibited Aurora from cross-examining the independent medical examiner appointed by the Department of Workforce Development ("the Department"), and further, that LIRC's decision is not based on credible and substantial evidence. Because LIRC permitted Aurora to present evidence rebutting the independent medical examiner and reasonably relied on the independent medical examiner's reports, we affirm.

## BACKGROUND

¶ 2. On February 27, 2001, Schaefer, employed as a courier by Aurora, slipped on ice and fell onto concrete while making a delivery. Schaefer experienced lower back pain and bilateral leg pain, but finished his shift.

¶ 3. On March 5, 2001, Schaefer went to Dr. James Cain, complaining of the injuries he sustained from the February 27, 2001 fall. Dr. Cain ordered an MRI, which showed that Schaefer had an L5–S1 recurrent disc herniation. As a result, Schaefer underwent surgery.

¶ 4. Because Schaefer had recurrent pain after his surgery, Dr. Cain referred Schaefer to Dr. Ali Sadeghi for pain management. Dr. Sadeghi reported that

811

Schaefer underwent several steroid injections for pain as well as trigger point injections. Schaefer was also given a number of oral narcotic medications and adjunct analgesics to control his lower back and bilateral leg pain.

¶ 5. Sometime in 2005, Schaefer developed right hip pain, unrelated to the work injury he suffered on February 27, 2001. On August 15, 2006, Schaefer underwent a total right hip replacement with positive results. Schaefer does not seek worker's compensation for difficulties related to his hip problem.

¶ 6. On July 10, 2006, Dr. Sadeghi completed a form entitled "Lumbosacral Spine Impairment Medical Assistant," setting forth Schaefer's work restrictions. In a post-hearing submission, Dr. Sadeghi explicitly stated that the limitations listed were those stemming from Schaefer's work-related back injury and not from his subsequent hip problem. According to the Administrative Law Judge's ("ALJ") summary of the document, Dr. Sadeghi:

> imposed restrictions limiting Schaefer to continuously sitting 15 minutes and continuously standing 30 minutes after which he would need to lie down. In an eight hour workday, Schaefer could sit less than two hours and stand/walk less than two hours, that Schaefer would require more than ten unscheduled breaks during the average workday, and that he could rarely lift less [than] ten pounds and was never to twist, stoop or bend. Additionally, Schaefer would likely be absent from work more than four days per month because of his impairments or treatment and would be unable to perform routine, repetitive tasks at a consistent pace or fast paced tasks. Schaefer would frequently experience symptoms which interfere with attention and concentration needed to perform even simple work tasks during a typical workday.

¶ 7. Aurora conceded liability for the February 27, 2001 fall and paid Schaefer temporary total disability benefits, temporary partial disability benefits, and some associated medical expenses.

¶ 8. On March 6, 2006, Schaefer filed a worker's compensation claim with the Department for the February 27, 2001 fall, seeking additional compensation.

¶ 9. Relying on Dr. Cain's and Dr. Sadeghi's medical opinions, the ALJ concluded that Schaefer was permanently and totally disabled. The ALJ further concluded that Schaefer had sustained a permanent total loss of earning capacity based on the vocational expert reports.

¶ 10. Aurora petitioned LIRC for review of the ALJ's findings and order. On review, Aurora argued that the ALJ should have disregarded Dr. Sadeghi's opinion because his opinion was "untruthful" and contained restrictions, not only for Schaefer's February 27, 2001 fall, but also for Schaefer's unrelated hip problem. LIRC remanded the case to the Department with directions to the ALJ to appoint an independent medical examiner to assess only Schaefer's disabilities related to the February 27, 2001 fall.

¶ 11. The ALJ appointed Dr. Jerome Ebert to perform the independent medical assessment of Schaefer's work-related disabilities. On November 6, 2008, Dr. Ebert conducted the independent medical examination and later submitted his assessment of Schaefer's work-related injuries to the ALJ. Dr. Ebert found that "100% of [Schaefer's] disability . . . is due to his back. In other words, if he had no hip problem whatsoever, his restrictions would be the same." Dr. Ebert went on to conclude that "Schaefer is disabled, and the following limitations are due entirely to his back problem: Sit for 1/2–hour, stand for 1/2–hour,

drive for 1/2–hour, walk 1/2–mile maximum. Sedentary duty lifting 10 pounds frequently, 20 pounds maximal with change in position every 1/2–hour."

¶ 12. After receiving Dr. Ebert's written assessment, the ALJ gave notice to both parties that each party could "submit medical records in response to the opinions of Dr. Ebert" within ninety days. The ALJ's notice also provided that once the additional medical records were received, the ALJ would send the case back to LIRC to render a decision.

¶ 13. LIRC reviewed Dr. Ebert's written assessment and then remanded the case to the Department a second time. On the second remand, LIRC instructed the ALJ to request clarification from Dr. Ebert by asking Dr. Ebert three specific questions:

(1) [H]ow many hours of work in an average workday would [Schaefer] be able to tolerate, given his physical restrictions;

(2) [W]ould [Schaefer]'s physical restrictions require him to take unscheduled breaks during an average workday, and if so, what is the estimate of how many such breaks would be required; and

(3) [W]ould Dr. Ebert expect the effects of [Schaefer]'s low back disability to cause him to miss work time on a recurring basis, and if so, what is the estimate of how often this missed work time might occur?

(Formatting added.) Dr. Ebert promptly replied, answering as follows: (1) "I would estimate [Schaefer] would be able to work 8 hours per day given [his] restrictions"; (2) "I'd estimate approximately two brief 10 minute breaks per day would be required"; and (3) "Chronic back pain of this nature does tend to flare at

times. Sometimes the flares are so severe that work would not be possible. I would estimate that this would occur approximately 2 times per month."

¶ 14. Following Dr. Ebert's response to the ALJ's three questions, both parties submitted a third set of vocational reports from their respective vocational experts. The vocational experts found one of Dr. Ebert's answers to the ALJ's three questions particularly relevant to their analysis of Schaefer's loss of earning capacity. This prompted Aurora to send a letter to LIRC requesting that LIRC remand the case to the Department for a third time to allow Aurora to cross-examine Dr. Ebert about his answers to the ALJ's three questions. Aurora also requested, as an alternative, that three additional questions be submitted to Dr. Ebert:

> (1) Is your estimate that Mr. Schaefer will miss work approximately two times per month due to his chronic back pain an opinion which you hold to a reasonable degree of medical probability?

> (2) Would it still be your estimate that Mr. Schaefer would miss work approximately two times per month if he worked on a part time basis within the restrictions you previously assigned?

> (3) What level of work could Mr. Schaefer perform that would not lead you to estimate that he would miss approximately two days from work per month due to the condition of his back, and what permanent functional restrictions would be appropriate for him in that situation?

¶ 15. On May 28, 2009, LIRC denied both of Aurora's requests and affirmed the Department's decision, finding that Schaefer was totally and permanently disabled and that Schaefer sustained a permanent total

815

loss of earning capacity. In denying Aurora's request for a third remand, LIRC stated that it:

> is familiar with Dr. Ebert, because he has provided tiebreaker medical opinions in numerous cases, and [LIRC] is satisfied that his medical opinions are routinely given to a reasonable degree of medical probability. There is no ambiguity in the opinions he has provided in this case, and [LIRC] sees no reasonable basis to question whether they were given to a reasonable degree of medical probability.
>
> [LIRC] also fails to see any useful purpose in questioning Dr. Ebert regarding part-time work or theoretical "levels" of work. Dr. Ebert's functional restrictions are credible, and Vocational Consultant Bruce Schuyler has credibly opined that based on those restrictions, [Schaefer] falls into the "odd lot" category as described in *Beecher v. LIRC*, 2004 WI 88, ¶ 31, 273 Wis. 2d 136, 682 N.W.2d 29.[1]

Aurora appealed to the circuit court and the circuit court affirmed LIRC's decision. Aurora now appeals to this court.

## DISCUSSION

¶ 16. Aurora asks that we reverse the circuit court's order and remand this case to LIRC for rehearing because it alleges that the Worker's Compensation Act required LIRC to allow Aurora an opportunity to cross-examine Dr. Ebert, the independent medical examiner, and that LIRC's decision to prohibit Aurora

---

[1] "[T]he odd-lot doctrine provides that some injured workers should be characterized as permanently, totally disabled even though they are still capable of earning occasional income." *Beecher v. LIRC*, 2004 WI 88, ¶ 2, 273 Wis. 2d 136, 682 N.W.2d 29.

from cross-examining Dr. Ebert violated Aurora's due process rights. Further, Aurora argues that LIRC's decision was not based on credible and substantial evidence. We address each contention in turn.

## I. The Worker's Compensation Act

¶ 17. Aurora first argues that LIRC acted in excess of its powers when it denied Aurora's request to cross-examine Dr. Ebert. In support of its argument, Aurora contends that WIS. STAT. §§ 102.17(1)(g) and 102.17(1)(d)1. (2007–08)[2] require LIRC to provide Aurora with an opportunity to cross-examine an independent medical examiner appointed by the Department. LIRC and Schaefer disagree, arguing that § 102.17(1)(g) only requires that Aurora be provided an opportunity to "rebut" the independent medical examiner's "report" and that § 102.17(1)(d)1. only requires that Aurora be permitted to cross-examine experts "presented by a party." We agree with LIRC and Schaefer.

### A. *Standard of Review*

¶ 18. Our scope of review is identical to that of the circuit court, and we review LIRC's decision, not the circuit court's. *Target Stores v. LIRC*, 217 Wis. 2d 1, 11, 576 N.W.2d 545 (Ct. App. 1998). "We affirm LIRC's findings of fact if they are supported by substantial evidence." *Id.* "[T]he agency's decision may be set aside by a reviewing court only when, upon an examination of the entire record, the evidence, including the inferences

---

[2] All references to the Wisconsin Statutes are. to the 2007–08 version unless otherwise noted.

therefrom, is found to be such that a reasonable person, acting reasonably, could not have reached the decision from the evidence and its inferences." *Id.*

¶ 19. However, reviewing courts are not bound by LIRC's determinations of law. *DILHR v. LIRC*, 155 Wis. 2d 256, 262, 456 N.W.2d 162 (Ct. App. 1990). This court will apply one of three levels of deference applicable to LIRC's interpretations of a particular statute: great weight, due weight, or no weight (*de novo* review). *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 659–60, 539 N.W.2d 98 (1995). Here, we need not determine exactly what level of deference is afforded, because we conclude that under any level of deference, the result is the same: LIRC acted within its statutory authority when it denied Aurora's request to cross-examine the independent medical examiner.

¶ 20. Aurora's claim that LIRC acted contrary to the Worker's Compensation Act requires that we interpret the meaning of certain statutes. When determining the legislature's intent, we begin with the language of the statute. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110.

> The purpose of statutory interpretation is to determine what a statute means in order to give the statute its full, proper, and intended effect. We begin with the statute's language because we assume that the legislature's intent is expressed in the words it used. Generally, language is given its common, ordinary, and accepted meaning. In addition, statutory language is interpreted in the context in which it is used, in

818

relation to the language of surrounding or closely-related statutes, and interpreted to avoid absurd or unreasonable results.

*Orion Flight Servs., Inc. v. Basler Flight Serv.*, 2006 WI 51, ¶ 16, 290 Wis. 2d 421, 714 N.W.2d 130 (citations and internal quotation marks omitted).

B. WISCONSIN STAT. § 102.17(1)(g)

¶ 21. We turn first to WIS. STAT. § 102.17(1)(g), which states, in relevant part:

> Whenever the testimony presented at any hearing indicates a dispute or creates a doubt as to the extent or cause of disability . . . the department may direct that the injured employee be examined . . . by or from an impartial, competent physician . . . designated by the department who is not under contract with or regularly employed by a compensation insurance carrier or self-insured employer. . . . *The report of the examination . . .* shall be transmitted *in writing* to the department and a copy of the report shall be furnished by the department to each party, *who shall have an opportunity to rebut such report* on further hearing.

(Emphasis added.)

¶ 22. Aurora concedes that WIS. STAT. § 102.17(1)(g) grants the Department the authority to request the opinion of an independent medical examiner. However, Aurora argues that once LIRC exercised its discretion, and ordered the Department to appoint an independent medical examiner, LIRC's discretion under § 102.17(1)(g) was exhausted. Aurora contends that LIRC was then required—by the legislature's use of the word "shall"—to provide Aurora with "an opportunity to rebut such report." Without citation to any

source, Aurora then goes on to argue that implicit in the word "rebut" is the right to cross-examine. We are unpersuaded.

¶ 23. Indeed, WIS. STAT. § 102.17(1)(g) provides LIRC with the discretion to request an independent medical examiner when "the testimony presented at any hearing indicates a dispute or creates a doubt as to the extent or cause of disability." And Aurora correctly notes that, once the independent medical examiner's report is obtained, § 102.17(1)(g) requires that the parties be permitted to "rebut such report." However, the right to rebut a report is not the same as the right to cross-examine the independent medical examiner who drafted the report.

¶ 24. If the legislature had intended to permit cross-examination of the independent medical examiner, it could have done so. Indeed, in other sections of the Worker's Compensation Act the legislature explicitly provides the right to cross-examine a witness, *see* WIS. STAT. § 102.17(1)(d)1. (providing that physicians presented by a party shall be subject to cross-examination), as it does in other statutes outside the Worker's Compensation Act, *see* WIS. STAT. § 907.06 (providing that an expert witness appointed by the circuit court "shall be subject to cross-examination by each party"). The legislature did not do so here.

¶ 25. If the legislature had wanted to permit the independent medical examiner to be cross-examined, it also would have needed to restructure the appointment /rebuttal process in the statute substantially. As drafted, WIS. STAT. § 102.17(1)(g) makes no provision for the independent medical examiner to give testimony at a hearing or a deposition, providing no opportunity for cross-examination to occur. And by stating that the independent medical examiner must submit a report "in

writing" to LIRC and the parties, the legislature indicates that it did not intend the examiner to attend the hearing. Finally, by stating that the parties shall have the "opportunity to rebut [the] *report*," as opposed to providing an opportunity to rebut the *examiner*, the legislature further indicates that its intent is that the independent medical examiner not be subject to cross-examination. (Emphasis added.) As a matter of statutory construction, nothing in the plain language of § 102.17(1)(g) states or implies that the legislature intended the "opportunity to rebut [the] report" to include the right to cross-examination of the examiner.

 *C. Wisconsin Stat. § 102.17(1)(d)1.*

■

 ¶ 26. Aurora also points to Wis. Stat. § 102.17(1)(d)1. in support of its argument that the Worker's Compensation Act requires it be permitted to cross-examine Dr. Ebert. Section § 102.17(1)(d)1. states, in relevant part:

> The contents of certified medical and surgical reports by physicians . . . and of certified reports by experts concerning loss of earning capacity under [Wis. Stat. §] 102.44(2) and (3), *presented by a party* for compensation constitute prima facie evidence as to the matter contained in those reports, subject to any rules and limitations the department prescribes. Certified reports of physicians . . . who have examined or treated the claimant, and of experts, if the practitioner or expert consents to being subjected to cross-examination also constitute prima facie evidence as to the matter contained in those reports . . . .

(Emphasis added.)

¶ 27. The plain language of WIS. STAT. § 102.17(1)(d)1. provides that certain expert reports are *prima facie* evidence when the author of the report consents to cross-examination. However, the statute does not require that all evidence submitted in a case be *prima facie* evidence. Rather, § 102.17(1)(d)1. merely shifts the burden of proof from the party submitting the evidence to the one opposing it when certain conditions have been met. *See Knight v. Milwaukee Cnty.*, 2002 WI App 194, ¶ 4, 256 Wis. 2d 1000, 651 N.W.2d 890 (providing that once a party relying on a presumption proves the basic fact, the opposing party must demonstrate that the nonexistence of the presumed fact is more probable). Consequently, we conclude that § 102.17(1)(d)1. does not require that Dr. Ebert be subjected to cross-examination before his reports can be submitted into evidence.

## II. Due Process

██

¶ 28. Next, Aurora argues that the right to cross-examine a witness is a basic necessity of due process and that LIRC denied Aurora this basic right when it refused to allow Aurora to cross-examine Dr. Ebert. LIRC and Schaefer respond that due process was satisfied by the opportunity to rebut Dr. Ebert's reports and that Aurora was given that opportunity. We agree with LIRC and Schaefer.

██ ██

¶ 29. Whether a party has been denied due process is a question of law we review without deference to the administrative agency. *Wright v. LIRC*, 210 Wis. 2d 289, 296, 565 N.W.2d 221 (Ct. App. 1997). " 'The ultimate test to determine whether due process of law has

been accorded a party to an administrative proceeding is the presence or absence of fair play.' " *Osterhues v. Board of Adjustment for Washburn Cnty.*, 2005 WI 92, ¶ 32, 282 Wis. 2d 228, 698 N.W.2d 701 (citation omitted). A fair hearing must include: "(1) [t]he right to seasonably know the charges or claims proffered; (2) the right to meet such charges or claims by competent evidence; and (3) the right to be heard by counsel upon the probative force of the evidence adduced by both sides and upon the law applicable thereto." *Theodore Fleisner, Inc. v. DILHR*, 65 Wis. 2d 317, 326, 222 N.W.2d 600 (1974) (internal quotations marks and citation omitted).

¶ 30. To begin, Aurora was timely notified of the claims against it and does not contend otherwise. Accordingly, the first factor to consider when determining whether a hearing satisfies due process was established.

¶ 31. We further determine that the second factor—an opportunity to meet the claims by competent evidence—has also been satisfied. After receiving Dr. Ebert's initial written report, forwarded to the parties by a letter dated November 11, 2008, Aurora was given ninety days to submit additional medical records. Aurora also asked for and was granted the opportunity to submit additional vocational information.

¶ 32. After Dr. Ebert submitted his second report, answering LIRC's three additional questions regarding Schaefer's work tolerance, that report was forwarded to the parties by a letter dated March 16, 2009. Aurora was then given thirty days to submit additional vocational information. Aurora did not request to submit additional medical information and did not request to cross-examine Dr. Ebert at that time.

¶ 33. The day its additional vocational reports were due, Aurora asked for additional time to respond to Dr. Ebert's latest report. The ALJ granted Aurora's

request and allowed it until May 1, 2009, to submit additional evidence in response to the second report. On May 1, 2009, five-and-a-half months after receiving Dr. Ebert's first report, Aurora requested to cross-examine Dr. Ebert for the first time.

¶ 34. In short, Aurora was given ample opportunity to present competent evidence—vocational and medical reports—challenging the findings in Dr. Ebert's reports and that is all that due process affords it. There is no *per se* right to cross-examine a court-appointed author of a report, especially when the request to do so comes late in the game, after LIRC had already granted the parties an extension of time within which to collect and submit evidence.

¶ 35. Likewise, the third factor is also satisfied because Aurora was given "the right to be heard by counsel upon the probative force of the evidence adduced by both sides and upon the law applicable thereto." As set forth above, LIRC gave Aurora considerable time to submit evidence challenging Dr. Ebert's reports.

¶ 36. Finally, in a last-ditch effort to convince us that its due process rights were violated, Aurora cites to *Theodore Fleisner, Inc.* for the proposition that LIRC cannot deny Aurora an opportunity to cross-examine Dr. Ebert. According to Aurora, in *Theodore Fleisner, Inc.*:

> a case in which the plaintiffs-appellants had asked the Department to adjourn a hearing so they could obtain and present new medical evidence to contradict the testimony of the applicant's treating doctors[,] [t]he Wisconsin Supreme Court affirmed the Department's denial of that request. The court held that *because the plaintiffs-appellants had had the opportunity to cross-examine the applicant's medical expert fully,* it could not

conclude that the plaintiffs'-appellants' due process right to a fair hearing had been infringed. [*See id.*, 65 Wis. 2d at 327.]

¶ 37. Even if we accept Aurora's recitation of *Theodore Fleisner, Inc.*'s facts and holding at face-value, they do not support Aurora's claim because: (1) they apply to the "applicant's" medical expert, as opposed to an independent medical examiner appointed by the Department; and (2) cross-examination is not the *only way* to ensure that due process has been satisfied, as we previously noted.

## III. Credible and Substantial Evidence

¶ 38. Finally, although the majority of its brief is dedicated to the arguments set forth above, Aurora also appears to argue that LIRC's conclusion that Schaefer suffered permanent total disability because of his work-related injuries is not based on credible and substantial evidence.[3] *See Target Stores*, 217 Wis. 2d at 11 ("We affirm LIRC's findings of fact if they are supported by substantial evidence."). The main thrust of Aurora's argument is that LIRC's decision to appoint Dr. Ebert showed a lack of confidence in Schaefer's expert, Dr. Sadeghi, such that Dr. Sadeghi's opinion was insufficient to meet Schaefer's burden of proof. Additionally, Aurora disputes the degree of certainty of Dr. Ebert's opinion.

---

[3] We note that although Aurora raises three issues in its appellate brief it sets forth only two issues in its "statement of issues." *See* Wis. Stat. Rule 809.19. Instead, Aurora's third argument, that LIRC's decision was not based on credible and substantial evidence, is raised haphazardly throughout its appellate brief, and as such, was difficult to follow and poorly explained. We caution counsel to be more careful in the future.

¶ 39. Whether a party has satisfied its burden of proof presents a question of law. *Currie v. DIHLR*, 210 Wis. 2d 380, 387, 565 N.W.2d 253 (Ct. App. 1997). Here, because the law LIRC relied on, the odd-lot doctrine, "is a common law adjunct to worker's compensation law," LIRC's determination that the evidence satisfied that law is entitled to no deference. *See Cargill Feed Div./Cargill Malt and AIG Cas. Co. v. LIRC*, 2010 WI App 115, ¶ 17, 329 Wis. 2d 206, 789 N.W.2d 326.

¶ 40. In order to establish a qualifying injury under the odd-lot doctrine:

> [a]n injured claimant . . . must make a prima facie case of permanent and total disability. The claimant may do so by producing certain basic facts—such as his or her injury, age, education, capacity, and training—which constitute prima facie evidence of a presumed fact: that the injured claimant is permanently and totally incapable of earning a living.
>
> Once the claimant establishes a prima facie case, the presumption that the claimant is permanently and totally disabled is triggered, and the burden shifts to the employer to prove "that it is more probable that the claimant is *not* permanently and totally incapable of earning a living." To meet its burden, the employer must "show that there exists suitable employment for the claimant. The employer does this by bringing forward evidence of actual job availability, making it *more probable than not* that the claimant *is* able to earn a living."

*Id.*, ¶¶ 20–21 (citations omitted).

¶ 41. To begin, we disagree with Aurora that LIRC's decision to order the ALJ to appoint an indepen-

dent medical examiner "is evidence that [LIRC] did not find Dr. Sadeghi's opinion credible enough to stand on its own." Wisconsin Stat. § 102.17(1)(g) permits the appointment of an independent medical examiner "[w]henever the testimony presented at any hearing indicates a dispute or creates a doubt as to the extent or cause of disability." In other words, § 102.17(1)(g) permitted LIRC to order the appointment of an independent medical examiner if Aurora's experts and Schaefer's experts, including Dr. Cain and Dr. Sadeghi, disagreed on the cause of Schaefer's disability. That LIRC was required to find a dispute existed before ordering the appointment of an independent medical examiner, does not mean that LIRC was required to find the experts were not credible. Consequently, once LIRC received Dr. Ebert's report, LIRC was free to reach a decision based on both Dr. Sadeghi's and Dr. Ebert's opinions. Nor was LIRC's decision left unsupported simply because Aurora's expert presented an alternate opinion. We defer to LIRC's assessment of witness credibility. Wis. Stat. § 102.23(6); *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 54, 330 N.W.2d 169 (1983).

¶ 42. Second, Aurora cursorily argues that LIRC erroneously relied on Dr. Ebert's medical opinion because it was not expressly given to the appropriate degree of medical certainty. Indeed, a medical opinion is inadmissible if it is based on speculation or conjecture. *Drexler v. All Am. Life & Cas. Co.*, 72 Wis. 2d 420, 432, 241 N.W.2d 401 (1976). Rather, a medical opinion must be given to a reasonable degree of medical probability. *Pucci v. Rausch*, 51 Wis. 2d 513, 518–19, 187 N.W.2d 138 (1971). However, "[n]o particular words of art are necessary to express the degree of medical certainty

required to remove an expert opinion from the realm of mere possibility or conjecture." *Drexler*, 72 Wis. 2d at 432. The test is whether the expert's words may be reasonably interpreted as demonstrating he or she was expressing an expert medical opinion. *Id.* The Wisconsin Supreme Court has held "expressions such as 'I felt,' 'I feel,' 'I believe,' 'liable,' 'likely,' and 'probably' to be sufficient." *Id.* at 432–33.

■■■

¶ 43. However, Aurora forfeited its right to claim that Dr. Ebert's testimony was inadmissible when Aurora failed to raise the issue before LIRC. *See generally State v. Ndina*, 2009 WI 21, ¶¶ 29–30, 315 Wis. 2d 653, 761 N.W.2d 612 (defining forfeiture as the failure to make a timely assertion of a right). While Aurora requested that LIRC remand the case to the Department so that Aurora could ask Dr. Ebert whether his opinions were given to a reasonable degree of medical probability, Aurora did not object to the admissibility of Dr. Ebert's reports when LIRC denied its request. And "[i]t is clear that once opinion evidence . . . is admitted without objection, it may be considered by the [factfinder]." *Drexler*, 72 Wis. 2d at 432.

■■■

¶ 44. In any event, it is clear that Dr. Ebert's reports satisfy the certainty requirements. Here, Dr. Ebert's written reports were created pursuant to the Department's request and Dr. Ebert knew they would be utilized in administrative proceedings as he had prepared many such reports in the past. Further, LIRC was familiar with Dr. Ebert's past reports and knew Dr. Ebert to be familiar with the requirement that medical opinions be given to a reasonable degree of medical probability. Given these facts, we conclude that LIRC reasonably concluded that the opinions in the reports

were given to a reasonable degree of medical certainty and properly relied on the reports as credible and substantial evidence.

¶ 45. Having reviewed the record, we agree with LIRC that given Schaefer's age (forty-seven-years-old), education (high-school-equivalency degree), various physical restrictions (as set forth by Dr. Sadeghi and Dr. Ebert), and the effects of his daily prescribed narcotic-based pain medication (straining his ability to think and concentrate), Schaefer has made a *prima facie* case that he is properly categorized as an odd-lot worker. *See Cargill*, 789 N.W.2d 326, ¶ 17. And in its appellate brief, Aurora does not even attempt to set forth evidence that demonstrates " 'that there exists suitable employment for' " Schaefer. *See id.*, ¶ 21 (citation omitted). Because Aurora has not sufficiently rebutted the presumption that Schaefer is permanently and totally incapable of earning a living, we conclude that Schaefer is indeed permanently and totally disabled.

*By the Court.*—Order affirmed.

¶ 46. FINE, J. (*dissenting*). As we have recognized, "John Henry Wigmore has characterized cross-examination as 'beyond any doubt the greatest legal engine ever invented for the discovery of truth.' 5 WIGMORE, EVIDENCE § 1367 (Chadbourn rev. 1974)." *State v. Yang*, 2006 WI App 48, ¶ 11, 290 Wis. 2d 235, 245, 712 N.W.2d 400, 405. Indeed, the right of cross-examination is the cornerstone of our judicial systems —both criminal and civil. *See Struckman v. Burns*, 534 A.2d 888, 892 (Conn. 1987) (recognizing common-law right in civil cases; not deciding whether recognition of the same right in civil cases is compelled by due process). This right applies even when the witness is

one selected by the trial court because he or she is deemed to be impartial. *See* WIS. STAT. RULES 906.14(1) ("The judge may, on the judge's own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."); 907.06(1) ("The judge ... may appoint [expert] witnesses of the judge's own selection. ... The witness shall be subject to cross-examination by each party.").

¶ 47. The legislature recognized the significance of the right to cross-examine when it authorized cross-examination of expert witnesses called by the parties. *See* WIS. STAT. § 102.17(1)(d)1. Consistent with WIS. STAT. RULE 907.06, the legislature also permitted the tribunal here to appoint "an impartial, competent physician" to report on the physician's analysis of the contested medical issues. WIS. STAT. § 102.17(1)(g). But rather than expressly permitting the parties to cross-examine the tribunal's witness, as do RULES 906.14(1) and 907.06(1), the legislature declared that the parties "shall have an opportunity to rebut such report on further hearing." § 102.17(1)(g). The Majority construes "rebut" restrictively; I would not. Accordingly, I respectfully dissent.

¶ 48. I agree that the word "rebut" does not say, *in haec verba,* "cross-examine." But the right to "rebut" what a witness (either expert or lay) says (either by admissible hearsay, the case here, or by actual testimony) is hollow without the right to cross-examine, if that is possible. Thus in *Struckman,* although reports of out-of-state medical experts could be received even though the experts could not be subpoenaed for trial because they were outside the court's territorial jurisdiction, the party against whom the reports were offered *could cross-examine* at an out-of-state deposition.

*Struckman*, 534 A.2d at 889–894. In my view, this is an irreducible minimum of "fair play." *See* Majority, ¶ 30.

¶ 49. Although, as the Majority notes, Aurora Consolidated Health Care and Sentry Insurance could submit additional materials, the essence of "fair play" is not only the right to introduce written materials but, crucially, the right to explore the "impartial" physician's methodology and analysis in order to discern flaws in his or her conclusions, which will, in reality, be dispositive. Without that right, to paraphrase a conundrum that was current as I was growing up–"Yes, you may go swimming, but don't go near the water."–although Aurora and Sentry may participate in the proceeding, they cannot do so meaningfully.

¶ 50. In my view, "rebut" must encompass the right to cross-examine, whether at a hearing or by deposition. Thus, I respectfully dissent.