AURORA CONSOLIDATED HEALTH CARE and
Sentry Insurance, a Mutual Company,
Plaintiffs-Appellants-Petitioners,

v.

LABOR AND INDUSTRY REVIEW COMMISSION and
Jeffrey Schaefer, Defendants-Respondents.

Supreme Court

*No. 2010AP208. Oral argument December 1, 2011.
—Decided May 11, 2012.*

2012 WI 49

(Also reported in 814 N.W.2d 824.)

For the plaintiffs-appellants-petitioners there were briefs filed by *Daniel Zitzer, Carrie May Poniewaz* and *Otjen, Van Ert & Weir, S.C.*, Milwaukee, and oral argument by *Daniel Zitzer*.

For the defendant-respondent, Labor and Industry Review Commission, the cause was argued by *R. Duane Harlow*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*.

For the defendant-respondent, Jeffrey Schaefer, there was a brief filed by *Robert T. Ward* and *Ward Law Firm*, Waukesha, and oral argument by *Robert T. Ward*.

¶ 1. ANN WALSH BRADLEY, J. The petitioners, Aurora Consolidated Health Care and Sentry Insurance, A Mutual Company (collectively, "Aurora") seek review of a decision of the court of appeals, which upheld a decision of the Labor and Industry Review Commission (LIRC) determining that Jeffrey Schaefer was permanently and totally disabled as a result of a work injury.[1] LIRC made this determination after denying Aurora's last-minute request to cross-examine or make further inquires of Dr. Jerome Ebert, an independent physician appointed by the Department of Workforce Development (the Department) to examine Schaefer and report on the cause of his disability.

¶ 2. Aurora asserts that it has both a statutory and a constitutional due process right to cross-examine Dr. Ebert. It contends that LIRC erroneously exercised

[1] *Aurora Consol. Health Care v. LIRC*, 2010 WI App 173, 330 Wis. 2d 804, 794 N.W.2d 520 (affirming a decision of the circuit court for Milwaukee County, Maxine A. White, J., presiding, which upheld LIRC's decision).

its discretion by denying its requests to cross-examine or make further inquiries of Dr. Ebert.

¶ 3. We determine that neither Wis. Stat. § 102.17(1)(g) nor Wis. Stat. § 102.17(1)(d)[2] provides Aurora a statutory right to cross-examine Dr. Ebert, an independent physician appointed by the Department. We further determine that LIRC did not violate Aurora's due process rights when it declined to remand for cross-examination.

¶ 4. Finally, we conclude that LIRC did not erroneously exercise its discretion. When it declined to remand for a third time to allow Dr. Ebert to be questioned further, LIRC considered the relevant facts, applied the proper standard of law, and reached a determination that a reasonable person could reach. Accordingly, we affirm the court of appeals.

I

¶ 5. Schaefer was hired by Aurora Consolidated Health Care in 1981. In 2001, he suffered a work-related injury. After his injury, Schaefer continued to perform various unskilled tasks for Aurora until he was terminated in 2006 due to Aurora's inability to accommodate his physical restrictions.[3] Schaefer filed a worker's compensation claim for permanent and total disability.

---

[2] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

[3] There is evidence in the record suggesting that Schaefer stopped working in 2005, rather than 2006. In its decision, LIRC determined that Schaefer was terminated in July of 2006 due to Aurora's inability to accommodate his various physical restrictions. Aurora does not challenge this finding of fact as clearly erroneous.

¶ 6. The medical and procedural facts in this case are complex. We begin by setting forth facts related to Schaefer's medical history, and then we turn to the procedural facts related to his worker's compensation claim. In setting forth these facts, we rely on the factual findings made by LIRC.

¶ 7. Schaefer has an extensive medical history, including at least two work-related injuries, several injuries that are not work-related, and other medical conditions. Although much of Schaefer's medical history was at issue during the proceedings before the Department, only two of Schaefer's conditions remain at issue in this appeal: (1) a back condition that was caused, Schaefer asserts, by a 2001 work-related injury; and (2) non-work-related avascular necrosis of the hips that developed in 2005 and resulted in a 2006 hip replacement. In setting forth Schaefer's medical history, we focus on these two conditions.

¶ 8. The work-related injury at issue in this case occurred on February 27, 2001, when Schaefer slipped and fell on a patch of ice while making a delivery for his employer. Six days after the February 27, 2001 incident, Schaefer sought treatment from Dr. James Cain and was diagnosed with a L5–S1 recurrent disc herniation. Dr. Cain performed a lumbar fusion in June of 2001. Schaefer temporarily returned to work, but the fusion did not heal properly, and Dr. Cain performed a second lumbar fusion in February of 2002.

¶ 9. At the time, Aurora conceded worker's compensation liability for Schaefer's injury and surgeries, and it paid temporary total disability benefits, temporary partial disability benefits, and some medical expenses. Following the 2002 surgery, Schaefer temporarily returned to work on a full-time basis.

¶ 10. In the fall of 2004, however, Schaefer began to experience recurrent low back and bilateral leg symptoms and pain, and Dr. Cain referred Schaefer to Dr. Ali Sadeghi for pain management. According to the medical records, Schaefer saw Dr. Sadeghi on a regular basis over a period of years, and they experimented with a variety of strategies to control the pain such as trigger point injections, Botox injections, and narcotic-based pain medication.

¶ 11. In 2005, Schaefer also developed pain in his right hip, and he underwent a total hip replacement on August 15, 2006 with a positive result. Schaefer has not claimed that the right hip pain and the hip replacement surgery resulted from any work-related injury.

¶ 12. Even after the hip replacement surgery, Schaefer continued to experience pain. In 2007, Schaefer underwent a third back surgery with a new doctor, who removed the fusion hardware and determined that the fusion was solid.

¶ 13. With the above as background, we turn to the facts related to Schaefer's present worker's compensation claim. Schaefer filed a claim with the Department, asserting that as a consequence of his work-related injury, he was permanently and totally disabled.

¶ 14. To support his claim of permanent total disability, Schaefer relied in part on a Lumbosacral Spine Impairment Medical Assessment Form completed by Dr. Sadeghi on July 10, 2006, just prior to his hip replacement surgery. In that form, Dr. Sadeghi noted that Schaefer had been diagnosed with post-laminectomy pain syndrome and bilateral avascular necrosis of the hips, and he imposed extreme physical restrictions that severely limited Schaefer's ability to work.

¶ 15. According to Dr. Sadeghi, Schaefer could not continuously sit for more than 15 minutes. He could not continuously stand for more than 30 minutes, and after standing for that duration, he would need to lie down. Dr. Sadeghi reported that during an eight-hour work-day, Schaefer could sit less than two hours and stand or walk less than two hours, and he would require more than ten unscheduled breaks. Further, Schaefer could lift less than 10 pounds only rarely, and could never twist, stoop, or bend. Dr. Sadeghi concluded that Schaefer would frequently experience symptoms which interfere with attention and concentration needed to perform even simple tasks, that he would be unable to perform routine, repetitive tasks at a consistent pace, and that he would likely be absent from work "more than four days per month" due to impairments or treatment. He concluded that the above restrictions are "likely to be permanent."

¶ 16. Both parties agreed that the restrictions imposed by Dr. Sadeghi were severe, and if adopted, the restrictions would mean that Schaefer was permanently and totally disabled. Additionally, both parties agreed that because Schaefer did not claim that his hip problem was work-related, any residual effects of the hip problem should not be taken into account when assessing Schaefer's disability for worker's compensation purposes.

¶ 17. The parties' disagreement revolved around the extent to which Schaefer's pain and the resulting restrictions were caused by the February 27, 2001 work-related injury. Aurora contended that Schaefer's pain and physical restrictions were not caused by the February 27 injury, and were instead caused by other injuries and medical conditions, including Schaefer's non-work-related hip problem.

¶ 18. To resolve the dispute, a hearing was held in front of an administrative law judge employed by the Department. At the hearing, Schaefer was the only witness to testify. Additionally, both parties presented the opinions of medical experts, and both parties retained vocational experts to evaluate Schaefer's post-injury earning capacity. In lieu of testifying, these experts submitted certified written reports.

¶ 19. Dr. Cain opined that Schaefer's work-related injury directly caused the recurrent disc herniation, that it was a substantial factor necessitating the lumbar fusion surgeries, and that Schaefer would not have needed the surgeries but for the work-related injury. By contrast, Aurora's medical expert opined that Schaefer's February 27 injury resulted in a minor sprain, that the effects of this injury were temporary, and that Schaefer's recurrent herniation and pain were caused by other preexisting and unrelated medical conditions including his necrosis of the hips.

¶ 20. Aurora's vocational expert opined that if Dr. Sadeghi's restrictions were accurate and reflected the effects of the work-related injury, rather than the effects of other, non-work-related injuries, Schaefer had sustained a permanent total loss of earning capacity. As a consequence of Schaefer's inability to maintain a consistent work schedule coupled with his physical restrictions and inability to maintain concentration, "he would have access to such a limited number and type of jobs that I would consider him 'odd lot.' "[4] However,

---

[4] The essential idea behind the "odd lot" doctrine is that permanent total disability under worker's compensation law "should not be taken literally to mean complete and utter helplessness, because some injured workers find themselves, because of their age, education, training, and overall capacity, 'incapable of becoming ordinary workmen of average capacity in

relying on Aurora's medical expert's conclusion that the February 27 fall was not the cause of Schaefer's continuing disability, Aurora's vocational expert asserted, "if there is no connection between a condition and industrial exposure, there can be no vocational impact or loss attributable thereto."

¶ 21. Because the parties disputed the cause of the restrictions imposed by Dr. Sadeghi, the administrative law judge agreed to hold the record open and allow the parties to make additional inquiries. In a post-hearing submission, Dr. Sadeghi clarified that the restrictions he imposed were limited to Schaefer's lower back condition and were not necessitated by his hip condition. In pertinent part, he wrote:

> As per our discussion, this is a clarification regarding the restrictions that were outlined in a lumbosacral spine impairment medical assessment form that was filled out by me. Please note that the restrictions only apply to Mr. Schaefer's lumbosacral spine and does not apply to any other organ system or musculoskeletal system such as the hips.

¶ 22. After receiving this clarification, the administrative law judge issued a written decision dated February 22, 2008. Finding the opinions of Dr. Cain and Dr. Sadeghi to be credible and persuasive, he concluded that Aurora was liable for the medical treatment necessitated by the February 27 injury. Based on Dr. Sadeghi's clarification that the restrictions resulted exclusively from Schaefer's low back problem and the opinions of both parties' vocational experts, he further

any well known branch of the labour market.' " *Beecher v. LIRC,* 2004 WI 88, ¶ 31, 273 Wis. 2d 136, 682 N.W.2d 29 (quoting *Cardiff Corp. v. Hall,* 1 K.B. 1009 (1911)).

concluded that Schaefer was permanently and totally disabled as a result of the February 27 injury.

¶ 23. Aurora sought LIRC's review. It argued that Dr. Sadeghi's post-hearing clarification was not credible. In support, Aurora explained that at the time that Dr. Sadeghi imposed the restrictions, he made direct reference to Schaefer's avascular necrosis of the hips, and various doctors had opined that Schaefer's hip problem was the primary source of his pain. Additionally, Aurora contended, the record revealed that Schaefer's condition improved after his hip replacement surgery.

¶ 24. LIRC remanded the matter to the Department for the appointment of "an independent physician to assess [Schaefer's] functional disabilities, not including any functional disability that may be attributable to his right hip condition or right hip surgery." *See* Wis. Stat. § 102.17(1)(g) (permitting the appointment of an impartial physician).[5] Additionally, LIRC ordered that the parties would be allowed to supplement the record with medical opinions in response to the independent physician's opinion, and thereafter, the matter would be returned to LIRC for a decision.

¶ 25. Pursuant to Wis. Stat. § 102.17(1)(g), the administrative law judge appointed Dr. Ebert, who

[5] Wisconsin Stat. § 102.17(1)(g) provides that the Department may direct the appointment of an "impartial" physician. LIRC's order remanded for the appointment of an "independent" physician. For the sake of consistency, we use the adjective "independent" throughout this opinion when referring to a physician appointed to render an impartial report. An independent physician appointed under Wis. Stat. § 102.17(1)(g) should not be confused with an independent medical examiner (IME) retained by one of the parties to refute the opposing party's case.

377

examined Schaefer and provided a written report. Dr. Ebert concluded that 100 percent of Schaefer's disability was due to work-related back problems, and that even without the hip problem, his restrictions would be the same:

> Jeff Schaefer has failed back surgery syndrome with activity-limiting low back pain but also with some chronic radicular symptoms. I was able to detect some problems that are attributable to the hip, namely some weakness in the right hip girdle which is very common after hip joint replacement but from a functional standpoint, this would not cause him to have very many limitations. The only restrictions I would give him for his hip would be perhaps no climbing ladders or carrying heavy objects frequently. In other words, I would not have him doing heavy duty work, but otherwise he does not need any restrictions with regard to his hip. I would say 100% of his disability at this point is due to his back. In other words, if he had no hip problem whatsoever, his restrictions would be the same.[6]

¶ 26. Dr. Ebert opined that the following restrictions were necessary as a result of Schaefer's disability: "Sit for 1/2–hour, stand for 1/2–hour, drive for 1/2–hour, walk 1/2–mile maximum. Sedentary duty lifting 10 pounds frequently, 20 pounds maximal with change in position every 1/2–hour."

---

[6] In support of his conclusion that Schaefer's disability was due to work-related back problems, Dr. Ebert reported:

[Schaefer's] current pain is in the low back with radiation all the way down the right leg with some numbness in the right greater than left feet. He has pain whenever he sits or stands for too long, and it is about 1/2–hour tolerance in each position. He reports this pain is essentially the same before he began having the hip pain and it remained unchanged after the hip surgery.

¶ 27. In response to Dr. Ebert's evaluation, Aurora obtained a supplemental report from its vocational expert. She opined that Schaefer was "qualified for a variety of jobs in the open labor market, such as security guard, counter clerk, retail sales, etc."

¶ 28. Schaefer submitted a letter to LIRC, asserting that Dr. Ebert's report made clear that "Dr. Sadeghi was not including restrictions attributable to a non-work-related hip condition when assessing the applicant's functional disabilities." However, Schaefer contended, Dr. Ebert's opinion was incomplete because it failed to address "the critical issue in the case: To what extent does the low back disability impact the applicant's ability to maintain a consistent work schedule." Schaefer argued that "the necessity to take several unscheduled breaks during the day and the likelihood that the applicant would be absent from work more than four times per month dictates that a reasonably stable labor market does not exist for the applicant."

¶ 29. LIRC remanded the matter for the second time, instructing the administrative law judge to ask Dr. Ebert to address the following questions:

> (1) how many hours of work in an average workday would the applicant be able to tolerate, given his physical restrictions; (2) would the applicant's physical restrictions require him to take unscheduled breaks during an average workday, and if so, what is the estimate of how many such breaks would be required; and (3) would Dr. Ebert expect the effects of the applicant's low back disability to cause him to miss work time on a recurring basis, and if so, what is the estimate of how often this missed work time might occur?

¶ 30. Dr. Ebert responded to the questions in writing, estimating that given his restrictions, Schaefer

would be able to work eight hours per day and that approximately two 10–minute breaks per day would be required. Dr. Ebert asserted: "Chronic back pain of this nature does tend to flare at times. Sometimes the flares are so severe that work would not be possible. I would estimate that this would occur approximately 2 times per month." The supplemental report was distributed to the parties on March 16, 2009.

¶ 31. Upon receiving this supplemental report, Aurora did not immediately request the opportunity to cross-examine Dr. Ebert. Rather, both parties requested 30 days to submit additional vocational reports.

¶ 32. Schaefer's vocational expert opined that because Schaefer would require unscheduled breaks and "would essentially miss 24 days (nearly five full work weeks) of work strictly because of his back condition," he was unemployable. Schaefer's expert explained that "few if any employers would find this level of absenteeism acceptable."

¶ 33. On April 17, 2009, Aurora requested a two-week extension to "provide our supplemental report in response to the most recent opinions of Dr. Ebert." It asserted: "We will submit our report on or before May 1, 2009."

¶ 34. On May 1, Aurora submitted a report from its vocational expert. Aurora's vocational expert "appreciate[d], and to some extent, under[stood]" that the necessity for unscheduled breaks was "at least on its face, of issue," and that two absences each month would have "more onerous implications."

¶ 35. Nevertheless, she opined that Schaefer could be retrained for professional or skilled employment in an environment which would allow Schaefer more freedom to take unscheduled breaks. She acknowledged that Schaefer would need computer lit-

eracy training and additional education, "at least a select Associate degree but more likely a Baccalaureate."

¶ 36. Further, Aurora's vocational expert opined that Schaefer's absenteeism could potentially be covered under the Family and Medical Leave Act (FMLA). She contended: "The benefits afforded by the FMLA become of even greater significance when one considers the understanding that Mr. Schaefer need not disclose to his employer ahead of time, i.e. during the interview process, that he will be absent from work twice monthly as that is not 'guaranteed,' but is rather, in Dr. Ebert's own words, an 'estimate.' "

¶ 37. Then, on May 1, 2009, Aurora sent a letter to LIRC, requesting that it remand the matter for a third time to allow for cross-examination of Dr. Ebert:

> I would like to have an opportunity to explore Dr. Ebert's opinions further on this issue. Therefore, I am requesting that the case be remanded again to the department, either for a continued hearing to elicit additional testimony from Dr. Ebert regarding his opinions, or to obtain a deposition of Dr. Ebert regarding these opinions.

Alternatively, Aurora's counsel asked that three additional questions be submitted to Dr. Ebert:

> (1) Is your estimate that Mr. Schaefer will miss work approximately two times per month due to his chronic back pain an opinion which you hold to a reasonable degree of medical probability?
>
> (2) Would it still be your estimate that Mr. Schaefer would miss work approximately two times per month if he worked on a part time basis within the restrictions you previously assigned?
>
> (3) What level of work could Mr. Schaefer perform that would not lead you to estimate that he would miss approximately two days from work per month due to the

condition of his back, and what permanent functional restrictions would be appropriate for him in that situation?

¶ 38. During the oral argument before this court, Aurora's attorney clarified that the sole reason he requested a hearing was to cross-examine or otherwise question Dr. Ebert:

The court: You did not request any hearing beyond the hearing for purposes of taking Dr. Ebert's testimony. Is that correct, or am I incorrect on that?

Aurora's attorney: That is correct. At the time I made that request, there was already an opinion from a treating surgeon in the record that was helpful to my case. I already had an independent medical examination that was part of the record that was helpful for my case. I had the first set of restrictions from Dr. Ebert that were helpful to my case. The only problem that I had was that second report of Dr. Ebert and the vocational opinions that followed it. Your honor, honestly, *the only thing I wanted to do is ask Dr. Ebert some questions about his opinions, and I think I had the right to do that under the statute.*

(Emphasis added.)

¶ 39. Four weeks after it received Aurora's request, LIRC issued a decision on the merits. In the decision, LIRC declined Aurora's request to order a third remand. It explained that further inquiry of Dr. Ebert was unnecessary because it would serve no useful purpose: "The commission is familiar with Dr. Ebert, because he has provided tiebreaker medical opinions in numerous cases, and the commission is satisfied that his medical opinions are routinely given to a reasonable degree of medical probability." Further, LIRC "fail[ed] to see any useful purpose in questioning Dr. Ebert regarding part-time work or theoretical 'levels' of work."

¶ 40. On the merits, LIRC determined that Schaefer was permanently and totally disabled under the odd lot doctrine. It rejected Aurora's assertion that the restrictions imposed by Dr. Sadeghi were due, in part, to Schaefer's hip condition. In reaching that conclusion, it relied on "Dr. Sadeghi's unambiguous assurance to the contrary, and the substantial degree of disability inferred from all the evidence to be attributable to the work-related back injury."

¶ 41. Additionally, LIRC rejected Aurora's assertion that Schaefer could be retrained for professional work. It explained that Schaefer was a 47–year-old unskilled worker with a GED, and that retraining would be "extremely difficult, if not impossible" because Schaefer can sit comfortably only for one-half hour at a time and because he takes a narcotic-based pain medication that interferes with his ability to think.

¶ 42. Finally, LIRC determined that Schaefer's frequent absences could not be overcome by invoking the provisions of the FMLA. It explained, "the FMLA is only applicable to employers who would have employed the applicant for more than 52 weeks for at least 1,000 hours during those 52 weeks," and with his expected absenteeism, Schaefer would be unlikely to retain a job for long enough to invoke the protections of the FMLA.

¶ 43. Aurora filed a complaint in the circuit court seeking review of LIRC's decision. It asserted that it had a statutory and a due process right to cross-examine Dr. Ebert, and that LIRC erroneously exercised its discretion when it declined Aurora's request for a remand.[7] The circuit court affirmed LIRC's decision.

---

[7] In addition, Aurora contended that LIRC erred by relying on the opinions of Dr. Sadeghi, which, it asserted, were not credible, and that there was no credible evidence to support

¶ 44. The court of appeals likewise affirmed. *Aurora Consol. Health Care v. LIRC,* 2010 WI App 173, 330 Wis. 2d 804, 794 N.W.2d 520. Judge Fine dissented, contending that a right to cross-examine an independent expert appointed by the Department "is an irreducible minimum of 'fair play.'" *Id.,* ¶ 48 (Fine, J., dissenting).

II

¶ 45. Although the medical and procedural facts of this case are complex, the questions before this court are discrete: does Aurora have either a statutory right or a constitutional due process right to cross-examine Dr. Ebert, an independent physician appointed by the Department under Wis. Stat. § 102.17(1)(g)?

¶ 46. If Aurora does not have a statutory or constitutional right to cross-examine Dr. Ebert, then LIRC's decision not to remand for cross-examination is discretionary. *See Theodore Fleisner, Inc. v. DILHR,* 65 Wis. 2d 317, 327, 222 N.W.2d 600 (1974). An agency's exercise of discretion will be upheld if it was made "based upon the relevant facts by applying a proper standard of law and represents a determination that a reasonable person could reach." *Verhaagh v. LIRC,* 204 Wis. 2d 154, 160, 554 N.W.2d 678 (Ct. App. 1996).

¶ 47. To resolve the question of whether Aurora has a right to cross-examine Dr. Ebert, we are required

---

LIRC's conclusion that it would be extremely difficult, if not impossible, for Schaefer to be retrained for professional work. Aurora appears to have raised similar arguments about the sufficiency of the evidence in the court of appeals. *See Aurora,* 330 Wis. 2d 804, ¶¶ 16, 38 n.3. However, it does not raise these arguments in this court, and we therefore do not address them.

to interpret the worker's compensation statute, Wis. Stat. ch. 102. Statutory interpretation is a question of law, which a court generally reviews independently of other court and agency determinations. *Hagen v. LIRC,* 210 Wis. 2d 12, 18, 563 N.W.2d 454 (1997). Nevertheless, a court will at times defer to an agency's interpretation of a statute. *Id.*

¶ 48. A reviewing court will employ one of three levels of deference when considering an administrative agency's interpretation of a statute: no weight, due weight, or great weight. *Id.* With all three levels of deference, the court must interpret the statute itself to determine whether the agency's interpretation is reasonable. *Racine Harley-Davidson, Inc. v. State,* 2006 WI 86, ¶ 15, 292 Wis. 2d 549, 717 N.W.2d 184.

¶ 49. In resolving this case, we are also required to interpret the constitutional demands of due process. Whether LIRC violated Aurora's due process rights by declining to remand for cross-examination is a question of law. Although this court may, in some cases, defer to an agency's interpretation of a statute, we will not defer to an agency's interpretation of the constitution. *See Wright v. LIRC,* 210 Wis. 2d 289, 296, 565 N.W.2d 221 (Ct. App. 1997). Accordingly, we answer this question of law independently of the determinations rendered by LIRC, the circuit court, and the court of appeals.

III

¶ 50. We begin by addressing Aurora's claim that it has a statutory right to cross-examine Dr. Ebert. Then, we turn to Aurora's claim that its due process rights were violated by LIRC's refusal to allow cross-

examination. Finally, we address whether LIRC errone-
ously exercised its discretion when it declined to re-
mand for a third time to allow Dr. Ebert to be
questioned further.

A

¶ 51. In its argument to this court, Aurora asserts
that the plain language of Wis. Stat. §§ 102.17(1)(g) and
102.17(1)(d)1 grants it a right to cross-examine Dr.
Ebert. At the outset, we observe that Aurora's letter to
LIRC requesting cross-examination did not cite these
statutes or specifically assert that there was a statutory
right to cross-examine Dr. Ebert. Accordingly, LIRC did
not provide any analysis squarely addressing the inter-
pretation of these statutes. Nevertheless, because it
denied Aurora's request, LIRC's decision can be con-
strued as making an implicit determination that the
relevant statutes contain no absolute right of cross-
examination.

¶ 52. In another situation, we might accord great
weight or due weight deference to LIRC's interpretation
of the statutes governing worker's compensation pro-
ceedings. Here, however, deference may be inappropri-
ate given that LIRC's apparent interpretation was
implicit and unsupported by analysis. In any event, it is
unnecessary to determine what level of deference to
give LIRC's implicit interpretation because we reach
the same result regardless of the level of deference
applied.

■

¶ 53. We turn next to the relevant statutes. Dr.
Ebert's report was not presented by one of the parties in
support of its case. Rather, he was an independent
physician appointed by the administrative law judge.

386

Accordingly, to determine whether there is a statutory right to cross-examine Dr. Ebert, we examine first Wis. Stat. § 102.17(1)(g), the subsection in the worker's compensation statute that addresses appointed physicians.

¶ 54. Wisconsin Stat. § 102.17(1)(g) provides that the administrative law judge can appoint an independent physician to examine the applicant:

> Whenever the testimony presented at any hearing indicates a dispute or creates a doubt as to the extent or cause of disability . . . , the department may direct that the injured employee be examined, . . . , by or from an impartial, competent physician, chiropractor, dentist, psychologist or podiatrist designated by the department who is not under contract with or regularly employed by a compensation insurance carrier or self-insured employer. . . .

¶ 55. Subsection (1)(g) provides further that the independent physician will submit a written report and the parties shall be given an opportunity to rebut that report:

> The report of the examination, autopsy, or opinion shall be transmitted in writing to the department and a copy of the report shall be furnished by the department to each party, who shall have an opportunity to rebut such report on further hearing.[8]

¶ 56. Aurora asserts that its right to "rebut" the independent physician's report necessarily includes the

---

[8] As set forth above at ¶ 38, Aurora's only purpose in seeking a remand was to cross-examine or otherwise question Dr. Ebert. Therefore, we do not address whether under other circumstances, a party would have a right to a hearing for other purposes.

right to rebut the report through cross-examination of the independent physician. We disagree.

¶ 57. "Rebut" is a general term, and it could encompass many different strategies employed by attorneys to undermine the credibility of an independent physician's report. For example, a party might rebut the conclusion of a report by pointing to internal inconsistencies, by presenting contrary opinions, or by introducing additional evidence, such as surveillance videos, that undermine the credibility of the report. It is not clear that the legislature intended to provide an absolute right to cross-examine the independent physician just because it provided the parties an opportunity to rebut the independent physician's written report.[9]

¶ 58. We interpret statutory terms "in the context in which [they are] used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes[.]" *C. Coakley Relocation Sys. v. City of Milwaukee,* 2008 WI 68, ¶ 17, 310 Wis. 2d 456, 750 N.W.2d 900. Our review of the surrounding and closely related statutes reveals that when the legislature intends to specifically provide a right of cross-examination, it has done so with express language.[10]

---

[9] The dissent's conclusion that "LIRC's action is contrary to the explicit statutory provision," dissent, ¶ 83, is based upon an assertion that the term "rebut" means the right of cross-examination, *id.,* ¶ 109. However, the dissent fails to provide any authority in support of this assertion. Rather, it cites only to the definition of "rebut" found in Black's Law Dictionary (a definition which does not mention cross-examination) and to a paragraph of Judge Fine's dissent in the court of appeals.

[10] Curiously, the dissent implies that by specifying a right to cross-examine witnesses in some statutes, the legislature intended that the response be limited solely to cross-examination.

¶ 59. For example, although sub. (1)(g) uses the general word "rebut" when discussing independent physicians, the very next subsection specifically provides for cross-examination of a different type of expert. Wisconsin Stat. § 102.17(1)(h) provides: "The contents of certified reports of investigation, made by industrial safety specialists who are employed, contracted, or otherwise secured by the department *and available for cross-examination,* . . . shall constitute prima facie evidence as to matter contained in those reports." (Emphasis added.)

¶ 60. Further, in various statutes involving court-appointed witnesses and experts, the legislature has likewise provided the right of cross-examination by using express language. Wisconsin Stat. § 906.14(1), which deals with witnesses that are called by a judge, specifically provides that the parties are entitled to cross-examine such witnesses:

> The judge may, on the judge's own motion or at the suggestion of a party, call witnesses, and *all parties are entitled to cross-examine witnesses thus called.*

(Emphasis added.)

¶ 61. Additionally, Wis. Stat. § 907.06(1), which deals with court-appointed experts, expressly provides that the experts shall be subject to cross-examination:

> . . . The judge may appoint any expert witnesses agreed upon by the parties, and may appoint witnesses of the

Dissent, ¶ 108 (citing Wis. Stat. § 102.17(1)(d)1). Under this rationale, Aurora would be precluded from responding to Schaefer's prima facie case by introducing evidence in the form of its own experts' reports, argument, or other contrary proof. The dissent's approach would mark an extreme departure from current practice.

judge's own selection. . . . A witness so appointed shall advise the parties of the witness's findings, if any; the witness's deposition may be taken by any party; and the witness may be called to testify by the judge or any party. *The witness shall be subject to cross-examination by each party,* including a party calling the expert witness as a witness.

(Emphasis added.)

¶ 62. By contrast, when the legislature drafted the subsection at issue in this case, Wis. Stat. § 102.17(1)(g), it chose to use the general term "rebut." Because it did not specify the right to cross-examination, it appears the legislature left to the Department's discretion whether to allow cross-examination in circumstances where it might provide relevant and probative evidence.

¶ 63. Having determined that sub. (1)(g), the subsection that addresses independent physicians, does not provide an absolute right of cross-examination, we turn to Aurora's argument about another subsection of the statute. Aurora relies on Wis. Stat. § 102.17(1)(d), which provides in relevant part:

> The contents of certified medical and surgical reports by physicians [and the reports of other professionals] licensed in and practicing in this state, and of certified reports by experts concerning loss of earning capacity . . . , *presented by a party* for compensation constitute prima facie evidence as to the matter contained in those reports, . . . Certified reports of physicians [and the reports of other professionals], wherever licensed and practicing, who have examined or treated the claimant, and of experts, *if the practitioner or expert consents to being subjected to cross-examination* also constitute prima facie evidence as to the matter contained in those reports . . . .

(Emphasis added.)

390

¶ 64. Aurora appears to acknowledge that the first sentence, which references experts "presented by a party," is not implicated here. However, it urges us to focus on the second sentence. It contends that by virtue of the second sentence of sub. (1)(d), Dr. Ebert has consented to cross-examination because he is a physician who examined Schaefer and provided a report.

¶ 65. Under our established methodology, we interpret statutes "not in isolation but as part of a whole." *C. Coakley Relocation Sys.,* 310 Wis. 2d 456, ¶ 17 (citing *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110). On its face, sub. (1)(d) governs experts that are presented by a party to establish a prima facie case,[11] not experts appointed by the Department to provide an impartial report.[12] Therefore, sub. (1)(d) is not implicated by Dr. Ebert's report. We determine that neither

---

[11] We recognize that in its decision, LIRC wrote: "Dr. Ebert's functional restrictions are credible, and [Schaefer's vocational expert] has credibly opined that based on those restrictions, the applicant falls into the 'odd lot' category . . . . The applicant therefore submitted a *prima facie* case for permanent total disability, which the commission finds that respondents have not successfully rebutted."

Dr. Ebert's report was not part of Schaefer's prima facie case for permanent total disability. Rather, Schaefer established a prima facie case when he submitted the medical reports of Dr. Sadeghi and Dr. Cain, which the administrative law judge found to be credible, as well as the report of his vocational expert. Because Aurora also submitted credible evidence, LIRC remanded for an independent opinion from Dr. Ebert.

[12] The parties did not address Wis. Admin. Code § DWD 80.22(2), which provides: "Use of reports shall be permitted in any case in which claim for compensation is made, provided the reporting doctor is available for cross examination." Given that the interpretation of this administrative regulation was not

Wis. Stat. § 102.17(1)(g) nor Wis. Stat. § 102.17(1)(d) provides Aurora a statutory right to cross-examine Dr. Ebert, an independent physician appointed by the Department.

B

¶ 66. Even if there is no statutory right to cross-examine an independent physician appointed by the Department, Aurora contends that the right to cross-examine witnesses is a basic necessity of due process. It asserts that LIRC violated the due process rights guaranteed by the Wisconsin Constitution, Art. I, § 1 when it declined to remand for cross-examination.[13]

¶ 67. "The function of due process is to minimize the risk of erroneous decisions." *W.J.C. v. County of Vilas,* 124 Wis. 2d 238, 242, 369 N.W.2d 162 (Ct. App. 1985) (Cane, P.J., concurring). We pause to observe that an independent physician appointed by the Department poses less of a risk of an erroneous decision than an expert hired by one of the parties to render a favorable decision.

¶ 68. In support of its argument that due process requires cross-examination, Aurora relies on *Illinois Steel Co. v. Jeka,* 123 Wis. 419, 101 N.W. 399 (1904). In

briefed or argued by the parties, we do not interpret it here. *Megal Dev. Corp. v. Shadof,* 2005 WI 151, ¶ 48, 286 Wis. 2d 105, 705 N.W.2d 645.

[13] Wisconsin Const. Art. I, § 1 provides: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

that case, the plaintiff brought an ejection action in circuit court, and the defendant argued that he had acquired the property in dispute by adverse possession. On review, this court stated that "cross-examination is regarded one of the most efficient means of discovering the truth, and so long as there is any reasonable ground to suppose that it is being pursued legitimately it should not be disturbed . . . . The use of it is not a mere privilege subject to discretionary judicial authority,—it is a right." *Id.* at 429.

¶ 69. We acknowledge the important role that cross-examination plays in the adversarial system, in which the goal is a search for the truth. Nevertheless, it does not rise to the level of a due process right in all instances.

¶ 70. It is significant that the above-quoted language from *Jeka* was made in the context of a judicial proceeding in circuit court, prior to the advent of Wisconsin's worker's compensation statute and the rise of the modern administrative state.[14] The United States Supreme Court has explained that "procedural due process in the administrative setting does not always require application of the judicial model." *Dixon v. Love,* 431 U.S. 105 (1977).[15]

---

[14] "Although administrative and quasi-administrative agencies have existed for quite some time, indeed the roots of administrative law can be traced back to Federalist era in the 1780s, it was not until the early part of this century, first with the progressive era and then with the New Deal, that the modern regulatory state emerged with any prominence." Sam Kalen, *The Transformation of Modern Administrative Law: Changing Administrations and Environmental Guidance Documents,* 35 Ecology L.Q. 657, 662 (2008).

[15] In a prison disciplinary proceeding, for example, inmates do not have a due process right to cross-examine witnesses

¶ 71. In an administrative proceeding, the "ulti-mate test to determine whether due process of law has been accorded a party . . . is the presence or absence of fair play." *Bituminous Cas. Co. v. DILHR,* 97 Wis. 2d 730, 734, 295 N.W.2d 183 (Ct. App. 1980). Our cases have determined that there are three elements of fair play in an administrative proceeding: (1) the right to seasonably know the charges or claims preferred; (2) the right to meet such charges or claims by compe-tent evidence; and (3) the right to be heard by counsel upon the probative force of the evidence adduced by both sides and upon the law applicable thereto. *Id.*

¶ 72. Here, there is no dispute that Aurora was seasonably informed of Schaefer's claims and that it was represented by able counsel. Additionally, Aurora had ample opportunity to present competent evidence about the cause and extent of Schaefer's disability, and it was represented by competent counsel who made compelling arguments about the force of the evidence adduced by both sides.

¶ 73. In the two months following Dr. Ebert's supplemental report, Aurora was given the opportunity to rebut the report with additional medical evidence as well as the opportunity to submit an additional voca-tional report. Although LIRC ultimately rejected Aurora's vocational expert's opinion that Schaefer's absenteeism could be overcome by invoking the provi-sions of the FMLA, the opinion was offered, it was

against them. *Wolff v. McDonnell,* 418 U.S. 539, 567–68 (1974). Even in judicial proceedings, courts have determined that there is not always an independent, absolute right to confront and cross-examine expert witnesses under the state and federal constitutions. *See, e.g., Walworth County v. Therese B.,* 2003 WI App 223, ¶ 10, 267 Wis. 2d 310, 671 N.W.2d 377.

introduced into evidence, and it was considered by LIRC when it rendered its decision. We conclude that LIRC did not violate Aurora's due process rights when it declined to remand for cross-examination.

C

¶ 74. Given our determinations that Aurora had no statutory or constitutional right to cross-examine Dr. Ebert, LIRC's decision to decline Aurora's request was discretionary. *See Theodore Fleisner, Inc.,* 65 Wis. 2d at 327. In its written decision, LIRC declined to grant Aurora's last-minute request for a third remand because it concluded that further clarification from Dr. Ebert was unnecessary and would serve no useful purpose.

¶ 75. LIRC explained that there was no need to remand to question Dr. Ebert about "part-time work or theoretical 'levels' of work." Dr. Ebert asserted that back pain tends to flare up. Under those circumstances, LIRC could reasonably infer that the absenteeism that would result from unpredictable flare ups would interfere with Schaefer's ability to work on a part-time or reduced basis, just as it would interfere with his ability to work on a full-time basis.

¶ 76. Additionally, LIRC explained that there was no need to remand to ask Dr. Ebert if his opinion was given to a reasonable degree of medical probability, the standard of admissibility for medical opinions. *See Drexler v. All Am. Life & Cas. Co.,* 72 Wis. 2d 420, 432, 241 N.W.2d 401 (1976). Dr. Ebert's written reports were created pursuant to the Department's request, and Dr. Ebert, who had prepared many such reports for the Department in the past, was aware that they would be

395

used in administrative proceedings. Because LIRC had received Dr. Ebert's past reports and knew that he was familiar with the standard of admissibility, LIRC was satisfied that Dr. Ebert's supplemental report was given to a reasonable degree of medical probability.

¶ 77. Under these facts, we conclude that LIRC reasonably determined that a remand was unnecessary and would serve no useful purpose. Further, we conclude that LIRC's refusal to remand for a third time was all the more reasonable, given the last-minute nature of Aurora's request.

¶ 78. Dr. Ebert's first report was provided to the parties on November 11, 2008, and Aurora submitted no request to cross-examine or further question him at that time. Even after March 16, 2009, the date that the parties were provided with Dr. Ebert's supplemental report, Aurora submitted no immediate request to cross-examine or further question Dr. Ebert. Rather, Aurora requested 30 days to submit an additional vocational report, and then on April 17, it requested a two-week extension to provide a "supplemental report." Aurora asserted: "We will submit our report on or before May 1, 2009." It was only on May 1 that Aurora requested the opportunity to cross-examine or further question Dr. Ebert.

¶ 79. When it declined to remand for a third time to allow Dr. Ebert to be questioned further, LIRC considered the relevant facts, applied a proper standard of law, and reached a determination that a reasonable person could reach. *See Verhaagh,* 204 Wis. 2d at 160. Accordingly, it did not erroneously exercise its discretion.

IV

¶ 80. In sum, we determine that neither Wis. Stat. § 102.17(1)(g) nor Wis. Stat. § 102.17(1)(d) pro-

vides Aurora a statutory right to cross-examine Dr. Ebert, an independent physician appointed by the Department. We further determine that LIRC did not violate Aurora's due process rights when it declined to remand for cross-examination.

¶ 81. Finally, we conclude that LIRC did not erroneously exercise its discretion. When it declined to remand for a third time to allow Dr. Ebert to be questioned further, LIRC considered the relevant facts, applied a proper standard of law, and reached a determination that a reasonable person could reach. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

DAVID T. PROSSER, J., did not participate.

¶ 82. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). Statutory procedures for worker's compensation actions matter because they provide a level playing field for both employees and employers. When the Labor and Industry Review Commission (LIRC) does not follow statutory procedures and this court affirms what LIRC has done, the court's decision harms both employees and employers by changing the process the legislature has created to fully and fairly resolve worker's compensation claims.

¶ 83. In the case now before us, LIRC arbitrarily prevented the employer, Aurora Consolidated Health Care, from rebutting, by cross-examination, the medical expert opinion upon which LIRC based its decision. LIRC's action is contrary to the explicit statutory provision under which LIRC proceeded when it appointed the medical expert. *See* Wis. Stat. § 102.17(1)(g). Furthermore, LIRC's arbitrary decision denied due process to the employer.

¶ 84. Permitting the parties to a worker's compensation action to question all expert opinions, no matter by whom the experts were retained, is consistent with ch. 102 and with due process. Because the majority opinion decides otherwise, I respectfully dissent.

## I. BACKGROUND

¶ 85. On February 27, 2001, Jeffrey Schaefer slipped and fell while making a delivery for Aurora. He injured his lower back in the fall.

¶ 86. Mr. Schaefer has a complicated medical history, including a preexisting back injury, for which he had back surgery in 2000, and necrosis of both hip joints, for which he had hip replacement surgery. Although it is without question that Mr. Schaefer injured his back due to the slip and fall, evaluation of the extent of his work-related disability was complicated by the existence of multiple pre-existing medical conditions.

¶ 87. On November 8, 2007, a Department of Workforce Development (DWD) administrative law judge (ALJ) held a hearing on Mr. Schaefer's worker's compensation claim.[1] Mr. Schaefer was the only witness. However, pursuant to Wis. Stat. § 102.17(1)(d), both Mr. Schaefer and Aurora submitted written reports from medical experts opining on the extent of Mr. Schaefer's disability that was work-related.

¶ 88. Dr. James Cain, Mr. Schaefer's medical expert, opined that Mr. Schaefer had reached a healing plateau and had a 40 percent permanent partial disability. Dr. Cain stated that 80 percent of his 40 percent

---

[1] The record was closed on December 13, 2007, and the ALJ issued his written decision February 21, 2008.

398

disability (i.e., 32 percent) was work-related.[2] Dr. Cain's opinion is contained in his April 26, 2006, response to a request for information about Mr. Schaefer's medical condition.

¶ 89. Dr. Sridhara Vasudevan, Aurora's medical expert, opined that Mr. Schaefer had a 35 percent permanent partial disability, but that none of his disability was work-related. Dr. Vasudevan's opinion is set out in an October 22, 2007, report made after his examination of Mr. Schaefer. Subsequent to the hearing, the ALJ issued a written decision that concluded that Mr. Schaefer had 100 percent permanent disability, due to his work-related injury.

¶ 90. On September 18, 2008, after LIRC's review of the ALJ's decision and the record, LIRC remanded the case to DWD to appoint an "impartial" physician, pursuant to Wis. Stat. § 102.17(1)(g), to assess what portion of Mr. Schaefer's functional disability was due to his hip condition and hip surgery. DWD retained Dr. Jerome Ebert.

¶ 91. Dr. Ebert examined Mr. Schaefer and issued a written report on November 6, 2008, in which he opined that Mr. Schaefer could stand, sit, or drive for one half hour before changing positions. He also said that Mr. Schaefer should not lift more than ten pounds on a frequent basis, with 20 pounds being his maximum lifting limitation. Dr. Ebert attributed all of the restrictions on Mr. Schaefer to his work-related injury.

¶ 92. On February 24, 2009, at Mr. Schaefer's request, LIRC remanded to DWD a second time because

---

[2] LIRC misstates Dr. Cain's opinion as a 40 percent permanent functional disability due to Mr. Schaefer's work-related injury, rather than 80 percent of 40 percent, as Dr. Cain reported.

Mr. Schaefer said that Dr. Ebert's opinion was incomplete. As part of its remand, LIRC gave Dr. Ebert a list of questions to address.

¶ 93. On March 3, 2009, Dr. Ebert responded to LIRC's questions. Dr. Ebert said that Mr. Schaefer should be able to work eight hours per day if Mr. Schaefer remained within the restrictions set out in Dr. Ebert's November 6, 2008, communication, and that Mr. Schaefer should be given approximately "two brief 10 minute breaks per day." In addition, Dr. Ebert stated, "Chronic back pain of this nature does tend to flare at times. *Sometimes* the flares are so severe that work would not be possible. I would *estimate* that this would occur approximately 2 times per month." (Emphases added.) Dr. Ebert did not say whether the "flares" would occur two times per month or whether they would be so severe two times per month that he would miss work two times per month. He also did not assign any percentage of bodily disability to Mr. Schaefer's physical limitations.

¶ 94. Based on Dr. Ebert's March 3 report, Aurora requested a remand to DWD to permit it to rebut Dr. Ebert's opinion by questioning him about his opinions. This is the first and only time that Aurora requested a remand to DWD; the other two remands were at LIRC's or Mr. Schaefer's request. LIRC denied Aurora's request to remand stating,

> There is no ambiguity in the opinions [Dr. Ebert] has provided in this case, and the commission sees no reasonable basis to question whether they were given to a reasonable degree of medical probability.
>
> The commission also fails to see any useful purpose in questioning Dr. Ebert regarding part-time work or theoretical "levels" of work.

*Schaeffer v. Aurora Consol. Healthcare* Claim No. 2001-012595 (LIRC, May 28, 2009).

LIRC made no mention of Wis. Stat. § 102.17(1)(g) under which Dr. Ebert was appointed, even though § 102.17(1)(g) contains specific directives about the rights of the parties following a report by a physician DWD has retained.

## II. DISCUSSION

### A. Standard of Review

¶ 95. We review LIRC's decision to prevent Aurora from questioning Dr. Ebert, not the decisions of the court of appeals or the circuit court. *Beecher v. LIRC,* 2004 WI 88, ¶ 22, 273 Wis. 2d 136, 682 N.W.2d 29. At issue in this case is whether LIRC correctly interpreted and applied Wis. Stat. § 102.17(1)(g) when it denied Aurora's request to cross-examine Dr. Ebert. Interpretation and application of a statute are questions of law. *County of Dane v. LIRC,* 2009 WI 9, ¶ 14, 315 Wis. 2d 293, 759 N.W.2d 571.

¶ 96. Generally, we give LIRC's interpretation of a statute one of three levels of deference: great weight deference, due weight deference or no deference, sometimes referred to as de novo review. *Id.* We may grant great weight deference to LIRC's interpretation of a statute when: (1) LIRC is charged with administration of the statute; (2) LIRC's interpretation is one of long standing; (3) LIRC employed its expertise or specialized knowledge in arriving at its interpretation; and (4) LIRC's "interpretation will provide uniformity and consistency in the application of the statute." *Id.,* ¶ 16 (citation omitted). If we accord great weight deference, we will uphold LIRC's interpretation if it is reasonable, even if another interpretation is more reasonable. *Id.*

¶ 97. We may grant LIRC's interpretation of a statute due weight deference when: (1) LIRC is

charged with administration of the statute; and (2) LIRC has some prior experience interpreting it, but such experience does not place it in a better position than the courts to interpret the statute. *Id.*, ¶ 17. If we accord due weight deference, we will uphold LIRC's reasonable interpretation of the statute, so long as another interpretation is not more reasonable. *Id.*

¶ 98. I do not dispute that the legislature charged LIRC with interpreting Wis. Stat. § 102.17(1)(g), or that LIRC probably has done so on other occasions. However, I can give no deference to LIRC's refusal to remand for a further hearing in this case because LIRC's interpretation is contrary to the words of the statute. *Lisney v. LIRC*, 171 Wis. 2d 499, 506–07, 493 N.W.2d 14 (1992) (explaining that no deference is due LIRC when its interpretation clearly contravenes the words of the statute). In addition, there is nothing in LIRC's written decision to show that LIRC employed its expertise and specialized knowledge in denying a further hearing as the statute requires. Accordingly, I grant no deference to LIRC's interpretation of § 102.17(1)(g).

¶ 99. Aurora also claims that its due process rights were violated by LIRC's refusal to permit it to question Dr. Ebert. We grant LIRC no deference when a claim of constitutional due process is at issue. *Coulee Catholic Schs. v. LIRC*, 2009 WI 88, ¶ 31, 320 Wis. 2d 275, 768 N.W.2d 868.

## B. Statutory Interpretation

¶ 100. Because Dr. Ebert was retained by DWD pursuant to Wis. Stat. § 102.17(1)(g), the interpretation and application of § 102.17(1)(g) are at issue. Section 102.17(1)(g) provides in relevant part:

> Whenever the testimony presented at any hearing indicates a dispute or creates a doubt as to the extent or cause of disability . . ., the department may direct that the injured employee be examined . . . by . . . an impartial, competent physician . . . . The report of the examination . . . shall be transmitted in writing to the department and a copy of the report shall be furnished by the department to each party, who shall have an opportunity to rebut such report on further hearing.

¶ 101. Statutory interpretation begins with the words the legislature chose because it is through those words that we determine what the legislature meant. *Sheboygan Cnty. Dep't of Health & Human Servs. v. Tanya M.B.*, 2010 WI 55, ¶ 27, 325 Wis. 2d 524, 785 N.W.2d 369. Statutory language is interpreted in the context in which it is used and to promote, rather than contravene, the statute's purpose. *Id.*, ¶ 28. If the words chosen by the legislature are plain and unambiguous, we apply the statute as written and go no further. *Id.*, ¶ 27.

¶ 102. Here, the legislative mandate, "shall have an opportunity to rebut such report on further hearing," is plain and unambiguous when read in the context of DWD's retaining a medical expert under Wis. Stat. § 102.17(1)(g), as DWD did here.[3] If the expert presents a report as Dr. Ebert did, then both parties "shall have an opportunity" for a "further hearing."

¶ 103. In order to come within the parameters of Wis. Stat. § 102.17(1)(g) and remand to DWD to retain a medical expert, LIRC must have concluded that the testimony presented at the hearing before the ALJ indicated a dispute or a doubt as to the extent or cause

---

[3] The majority opinion agrees that LIRC employed Wis. Stat. § 102.17(1)(g) when DWD retained Dr. Ebert. Majority op., ¶ 25.

of Mr. Schaefer's disability. This is so because concerns about the extent or cause of an employee's disability are the statutory prerequisites for DWD to retain a medical expert. Therefore, the record created before the ALJ must have been insufficient to answer the worker's compensation questions that Mr. Schaefer's condition presented.

¶ 104. However, even though LIRC remanded to appoint an expert under Wis. Stat. § 102.17(1)(g), in its May 29, 2009, written decision, LIRC did not mention the mandated "opportunity" that § 102.17(1)(g) accords both parties when a report is presented by a medical expert that DWD retained. Instead of applying § 102.17(1)(g), LIRC stated that "[t]here is no ambiguity in the opinions [Dr. Ebert] has provided in this case, and the commission sees no reasonable basis to question whether they were given to a reasonable degree of medical probability."

¶ 105. However, there is ambiguity in Dr. Ebert's saying that the "flares" of Mr. Schaefer's back pain may occur with "some frequency" and that some of those flares may require a missed day of work, without explaining whether all "flares" would require a missed day of work. Perhaps if asked, Dr. Ebert would have opined that flares could occur two times per month, but that not every flare would require a missed day of work. This possibility is entirely reasonable because Dr. Ebert also concluded that Mr. Schaefer could work an eight hour day with only "two brief 10 minute" breaks.

¶ 106. It is impossible for anyone to determine what Dr. Ebert would have said. However, what Dr. Ebert might have said is not what causes me to dissent. I dissent because Wis. Stat. § 102.17(1)(g) unambiguously provides that if DWD employs a physician expert who provides a report, then each party "*shall have an*

404

*opportunity to rebut such report on further hearing."*
Aurora asked for such "opportunity," and LIRC refused
without addressing the statutory requirements.

¶ 107. The majority affirms LIRC's decision by
opining that Aurora had no statutory right to cross-
examine Dr. Ebert.[4] However, Wis. Stat. § 102.17(1)(g)
does not say there is no right to cross-examine the
expert retained by DWD. Rather, § 102.17(1)(g) grants
two rights to parties in worker's compensation actions
where DWD has retained an expert: (1) the opportu-
nity to "rebut" the report; and (2) the opportunity of a
"further hearing."[5]

¶ 108. It is true that some of the statutory provi-
sions that relate to reports presented in a worker's
compensation hearing limit responses to those reports
to cross-examination. *See* Wis. Stat. § 102.17(1)(d)1.
However, § 102.17(1)(g) is not so limiting because it
grants a right to "rebut" the report of a medical expert
that DWD retains and to do so at a hearing held after
the receipt of the report.

¶ 109. "Rebut" is a term that encompasses more,
not less, than a provision providing only for cross-
examination. As Black's Law Dictionary explains, "re-
but" means "To refute, oppose, or counteract (some-
thing) by evidence, argument, or contrary proof, [e.g.,]
rebut the opponent's expert testimony." *Black's Law
Dictionary* 1381 (9th ed. 2009). Evidence may be pre-
sented by direct questioning and by cross-examination.
Furthermore, the most powerful evidence is often ob-

---

[4] Majority op., ¶ 63.

[5] The majority opinion ignores the statutory mandate of the
"opportunity" for a "further hearing." Yet, Wis. Stat.
§ 102.17(1)(g) plainly requires a "further hearing" under the
circumstances presented here.

tained by cross-examination. *See Aurora Consol. Health Care v. LIRC,* 2010 WI App 173, ¶ 46, 330 Wis. 2d 804, 794 N.W.2d 520 (Fine, J., dissenting). Accordingly, I conclude that Wis. Stat. § 102.17(1)(g) affords both parties the opportunity to present additional evidence at a future hearing, which evidence may be presented by direct examination and by cross-examination.

¶ 110. And in addition, there is no need for the majority to affirm the court of appeals, as this court must review the opinion of LIRC, not that of the court of appeals. *Beecher,* 273 Wis. 2d 136, ¶ 22. However, instead of reviewing LIRC's decision, the majority does what the court of appeals did. The majority opinion interprets a statute that LIRC ignored. In so doing, it permits LIRC to ignore the will of the legislature and creates precedent that limits rights that the legislature established in Wis. Stat. § 102.17(1)(g).

## C. Due Process

¶ 111. Aurora asserts that in addition to violating the rights the legislature accorded under Wis. Stat. § 102.17(1)(g), LIRC violated Aurora's right to due process of law, as guaranteed by Article I, Section 1 of the Wisconsin Constitution. The foundation of due process is a fair proceeding. *See Wright v. LIRC,* 210 Wis. 2d 289, 296, 565 N.W.2d 221 (Ct. App. 1997). However, arbitrary decision making trammels fundamental fairness. It has long been the rule in Wisconsin that an order issued in an agency proceeding where there has not been a full hearing on the evidence underlying the order is a denial of due process. *See Bituminous Cas. Co. v. DILHR,* 97 Wis. 2d 730, 735, 295 N.W.2d 183 (Ct. App. 1980).

¶ 112. Here, Aurora asked for a hearing to question Dr. Ebert about the opinions he gave in his March

3 report. LIRC denied that request because LIRC saw "no reasonable basis to question" whether Dr. Ebert's opinions were given to a reasonable medical probability. However, Dr. Ebert opined that "flares" of back pain could occur and "*sometimes*" the flares would require a day off work. Dr. Ebert also "*estimate*[ed]" that the flares could occur twice a month. The words Dr. Ebert chose are not those one usually sees in opinions given to a reasonable degree of medical certainty. *See Milwaukee Police Ass'n v. Flynn,* 2011 WI App 112, ¶ 7 n.3, 335 Wis. 2d 495, 801 N.W.2d 466.

¶ 113. Furthermore, LIRC said it saw no "useful purpose" in Aurora's request for questions about part-time work. However, Dr. Ebert said Mr. Schaefer could work eight hours per day, with only two, brief ten minute breaks. How that opinion lines up with Dr. Ebert's opinion on "flares" of back pain is anything but clear.

¶ 114. Because this was an opinion DWD ordered and upon which LIRC relied, both parties should have been permitted to participate in a hearing to explore that opinion by questioning. Denial of a hearing on Dr. Ebert's report is the denial of the constitutional right to a fair hearing, as well as a statutory violation. *See Waste Mgmt., Inc. v. LIRC,* 2008 WI App 50, ¶ 9, 308 Wis. 2d 763, 747 N.W.2d 782 (stating the elements necessary for a fair hearing). Due process is violated because Dr. Ebert's opinion could not be explored and it was the basis for LIRC's order.

## III. CONCLUSION

¶ 115. I conclude that LIRC arbitrarily decided to prevent Aurora from rebutting, by cross-examination, the medical expert opinion on which LIRC based its

decision. LIRC's action is contrary to the explicit statutory provision under which LIRC proceeded when it retained the medical expert. *See* Wis. Stat. § 102.17(1)(g). Furthermore, LIRC's arbitrary decision denied due process to the employer.

¶ 116. Permitting the parties to a worker's compensation action to question all expert opinions, no matter by whom the experts were retained, is consistent with ch. 102 and with due process. Because the majority opinion decides otherwise, I respectfully dissent.